896 A.2d 380

**Robert Angel PEREZ**

v.

**STATE of Maryland.**

**No. 495, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

April 11, 2006.

250

William C. Brennan, John M. McKenna, Upper Marlboro, for Appellant.

Diane E. Keller (J. Joseph Curran, Jr., Atty. General on the brief), Baltimore, for Appellee.

MURPHY, C.J., SALMON and DEBORAH S. EYLER, JJ.

DEBORAH S. EYLER, Judge.

In the Circuit Court for Prince George's County, Robert Angel Perez, the appellant, was convicted by a jury of two counts of felony murder, use of a handgun in a crime of violence, conspiracy to commit murder, two counts of robbery with a deadly weapon, and use of a handgun. He was sentenced to two consecutive terms of life without parole for the murder convictions, consecutive 20 and 10–year sentences for the use of a handgun and conspiracy convictions, and a concurrent 20–year sentence for use of a handgun. The robbery convictions were merged.

The appellant presents four questions for review, which we have rephrased as follows:

I. Did the motion court err by not suppressing his three written statements and one oral statement to the police?

II. Was the trial court's jury instruction about prompt presentment legally incorrect?

III. Did the trial court err by excluding evidence of a "false confession" by Antonio Meyers?

IV. Did the trial court err by excluding the testimony of defense witness Derrick Eberhardt?

For the following reasons, we shall reverse the judgments and remand the case to the circuit court for further proceedings.

## FACTS AND PROCEEDINGS

On September 15, 1999, Nirwan Tharpar, a veterinarian, and Shashi Tharpar, his wife, were murdered at their animal

hospital in Bladensburg. An employee of the hospital arrived at work and, upon finding the Tharpars on the floor, called the police. When the police arrived, they determined that Dr. Tharpar was dead from gunshot wounds to his head and he had sustained cutting wounds to his throat. Mrs. Tharpar still was alive, despite having been shot in the neck and just above both eyes. She was in dire straits, but managed to give a description of her assailant as a tall black male in his thirties. Mrs. Tharpar died shortly after being taken to the hospital.

Almost a year later, on August 7, 2000, a man named Keith Mahar told Prince George's County Detective Joseph Hoffman that the appellant and a man named Thomas Gordon had admitted to killing the Tharpars at the animal hospital, during a robbery. The next day, the police obtained an arrest warrant for the appellant. Ultimately, the appellant was charged with numerous crimes in connection with the deaths. Gordon also was charged; he was tried separately, however.

The State's theory of prosecution was that Gordon was the shooter and the appellant assisted him, by acting as the driver and "look-out" man.[1] In the appellant's first trial, a jury convicted him of two counts of felony murder, two counts of robbery with a deadly weapon, and related offenses. The court sentenced the appellant to two terms of life without parole.

On appeal, this Court vacated the judgments and remanded the case for further proceedings, including a new hearing on a motion to suppress three written statements and one oral statement the appellant had given to the police; and a new trial. *Perez v. State ("Perez I")*, 155 Md.App. 1, 841 A.2d 372 (2004) (*en banc*).

A new suppression hearing was held on September 13 and 14, 2004. On October 25, 2004, the court issued a memorandum opinion and order denying the motion to suppress. The appellant's second trial took place from November 15, 2004, to

---

1. Gordon matched the description of the assailant given by Mrs. Tharpar.

November 19, 2004. After sentencing, on April 1, 2005, the appellant noted the instant appeal.

We shall recite the facts in detail in our discussion of the issues.

## DISCUSSION

### I.

### *Did the Motion Court Err By Not Suppressing the Appellant's Statements to the Police?*

#### (A)

At the new suppression hearing, the State called Detectives Hoffman, Melvin Powell, Nelson Rhone, Ismael Canales, Robert Turner, and Lieutenant Joseph McCann to testify. It introduced into evidence documents including waivers signed by the appellant during the time he was being interrogated by the police and written statements the appellant gave the police.

The evidence adduced by the State showed the following:

Detective Powell arrested the appellant on a warrant for the Tharpar murders on August 9, 2000, at 12:31 a.m. The appellant was transported to the Homicide Unit of the Criminal Investigation Division ("CID") of the Prince George's County Police Department, where he arrived at 12:42 a.m. From then until he was taken to a District Court Commissioner at 12:35 a.m., on August 11, 2000, the appellant was confined to an interview room, except during bathroom breaks.

The interview room was 8 feet by 10 feet and was carpeted on its floor and walls. It did not have any windows. It had one door with a peephole. There was a table and three chairs in the room. The temperature inside the room was the same as in the rest of the building. The Commissioner's Office was in the same building, just a short walk from the interview room.

The appellant was 18 years old, had a tenth grade education, and was able to read, write, and understand English. He had had prior dealings with the criminal justice system; some ninety days before this arrest, he had been before a Commissioner in another case. He was not under the influence of drugs or alcohol. While in the interview room, the appellant was not handcuffed or otherwise restrained.

At 12:59 a.m., Detectives Hoffman and Turner entered the interview room. The appellant was seated at the table. Detective Hoffman began reviewing an Advice of Rights and Waiver Form with him. That process was completed and the appellant signed the form at 1:03 a.m. The appellant waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Detective Hoffman questioned the appellant, eliciting background information, including the appellant's name, address, date of birth, phone numbers, friends, and employment status. At 1:40 a.m., Detective Hoffman gave the appellant a drink of water. The detectives then left the interview room.

From 1:40 a.m. to 2:25 a.m., the appellant was left alone. During that time, the detectives conferred with other detectives who were investigating the murders.

At 2:25 a.m., the detectives returned and continued the interview. They talked with the appellant about some burglaries in Bowie. They asked him if he knew Gordon. The appellant denied knowing him. When shown a Polaroid picture of Gordon, the appellant identified him as someone he knew as "Lucky." The detectives confronted the appellant about the Tharpar homicides, accusing him of committing them. The appellant denied any involvement in the killings. At 3:45 a.m., the appellant was given water. The detectives then left the interview room.

At 4:31 a.m., Detective Hoffman checked on the appellant, who appeared to be sleeping. The detective did not enter the interview room.

At 4:40 a.m., Detective Turner returned to the interview room and began to question the appellant.[2] He told the appellant that Gordon had implicated him in the murders. (In fact, the detective had not yet spoken to Gordon.) The appellant responded by continuing to deny that he knew anything about the murders. Detective Turner questioned him about whether he had ever seen Gordon with a gun. The appellant said something about Gordon's having used a gun to rob a 7–Eleven Store in Hagerstown. When asked whether Gordon had ever fired a gun in his presence, the appellant at first said no, but later said he had seen Gordon fire a gun twice, once at an address in Bowie. In the course of the interview, and during later interviews, the appellant gave inconsistent information about how long he had known Gordon.

Detective Turner left the interview room at 5:50 a.m. The appellant was alone until 7:25 a.m. At that time, Detective Rhone entered the room. The appellant was asleep. The detective shook his arm to wake him up. He introduced himself and began interviewing the appellant about background information, including his name, address, date of birth, relatives' names, employment, education, vehicles owned, criminal history, and friends. At 8:30 a.m., the appellant was given a glass of water and Detective Rhone took him to the bathroom.

Ten minutes later, the appellant and Detective Rhone returned to the interview room. The detective told the appellant he was at CID in regard to the Tharpar killings. Detective Rhone questioned the appellant about his friends and about breakings and enterings he had committed with "Lucky." At 9:10 a.m., Detective Rhone presented the appellant with an Advice of Rights and Waiver Form, and began to review it with him.[3] At 9:15 a.m., the appellant signed the second Advice of Rights and Waiver Form.

---

**2.** Detective Blazer accompanied Detective Turner but left after a brief period of time and without asking any questions. (Detective Blazer's first name does not appear in the record.)

**3.** All the "Advice of Rights and Waiver Forms" presented to the appellant and signed by him were identical.

At 9:28 a.m., Detective Rhone gave the appellant a candy bar and water. Detective Rhone began talking about the Tharpar murders, and told the appellant he was a target in the investigation of the killings. At first, Perez denied any knowledge of the murders. He then told Detective Rhone about "one time" that he and Gordon had robbed a place that turned out to be an animal hospital.

At 11:56 a.m., the appellant was given a bathroom break. He then was returned to the interview room, and at 12:07 p.m., began to give a written statement. Detective Rhone filled out the background information about the appellant on the top part of the form. On the blank part of the form, the appellant wrote out his statement. Then, the appellant and Detective Rhone added a "Q & A". Detective Rhone wrote out the questions and the answers that the appellant gave orally, and the appellant initialed the written answers and signed at the bottom of each page.

In the written statement, the appellant said that one day he and Gordon were riding together in the appellant's car. Gordon said he needed to commit a robbery to get some money. Gordon pointed out a building and said that was the place they should rob. Gordon had a gun. The appellant was not armed. They drove into the parking lot of the building. The appellant got out of the car and walked into the lobby. He saw a white woman in her forties or fifties. He knew he was in an animal hospital because there were pictures of animals on the walls. He returned to the car and parked away from the hospital. He and Gordon walked into the animal hospital together. The same woman was there. Gordon asked the appellant if anyone else was there and the appellant replied, "not that [he] knew of."

According to the statement, the appellant and Gordon were in the animal hospital together for 2 or 3 minutes. The appellant then left, returned to the car, and drove it near to the hospital door so they could make a quick exit. When Gordon returned to the car, the appellant saw the gun in his

waistband. They drove off. Gordon gave the appellant $20 for gas. They didn't talk about the robbery afterwards.

The written statement was completed at 2:00 p.m. At 2:20 p.m., the appellant was given a fast food sandwich and then was taken for another bathroom break. Detective Rhone left after that.

At 2:58 p.m., Detective Hoffman entered the interview room. He presented the appellant with another Advice of Rights and Waiver Form and reviewed it with him. The appellant signed the form at 3:01 p.m. Detective Hoffman interviewed him about the robbery of the animal hospital. The appellant said that Gordon had fired a gun three times while they were inside the hospital. At 3:31 p.m., Detective Hoffman and the appellant began to fill out another written statement and to draw a map of the location. Detective Hoffman wrote the background information about the appellant on the top part of the form. The appellant wrote two pages of narrative on the form. Detective Hoffman then wrote three pages of "Q & A" comprised of questions by him and the answers given by the appellant and initialed by him.

In this second written statement, the appellant said that, on the day he was talking about, a man named Jason Hicks called and asked him to pick up Gordon at his house. The appellant drove to Gordon's house and Gordon got in his car. At first, Gordon wanted to meet a girl he knew, to get money from her. When they could not find her, Gordon suggested they "jump" someone. The appellant refused. Gordon then said he wanted to rob a store. The appellant said he did not want to. Gordon directed the appellant to pull into the parking lot of the animal hospital. The appellant went inside to see if there were any police there, which there were not. He returned to the car and parked it.

The appellant and Gordon walked into the animal hospital. The appellant was saying he did not want to rob the place, but Gordon was insisting. Gordon had a gun. The appellant was scared. Gordon walked up to the counter and said, "This is a stickup. Give me all your money." The appellant was by the

door, looking outside. He heard a bang and dropped to the floor. He turned around and saw Gordon pointing the gun somewhere. Gordon then shot the gun twice. The appellant ran outside and got in the car. He waited for four or five minutes, until Gordon returned. Gordon said he thought he had shot someone "in the arm or somewhere." They drove off. Gordon gave the appellant $30 dollars for gas.

This second written statement and the map were completed at 5:01 p.m. The appellant was taken to the bathroom. He then was returned to the interview room and was left alone.

At 7:00 p.m., Detective Canales entered the interview room and told the appellant he was there to administer a Voice Stress Analysis (lie detector) test. The appellant agreed to undergo the test. Detective Canales reviewed an Advice of Rights and Waiver Form and a Truth Verification Release Form with the appellant, who signed them at 7:09 p.m. The lie detector test was administered and was completed at 8:10 p.m. Detective Canales exited the interview room, leaving the appellant alone.

Sometime between 11:00 and 11:30 p.m., Gordon arrived at CID.

At 12:05 a.m. (August 10), Detective Hoffman entered the interview room and saw the appellant sleeping. The appellant got up when the detective entered the room. Detective Hoffman presented the appellant with a fourth Advice of Rights and Waiver Form and reviewed it with him. The appellant signed the form at 12:08 a.m. At 12:10 a.m., the detective presented the appellant with a "Commissioner's Waiver," which the appellant signed.

The "Commissioner's Waiver" stated: "It is now 12:10 a.m. on August 10, 2000. You have been in the custody of the Prince George's County Police for over 23 hours. You have a right to be presented before a District Court Commissioner within 24 hours of your apprehension." The form then set forth a series of questions, with a space next to each for the appellant to write his answer. The questions and answers as written by the appellant, were:

Q1: Do you have any objection to remaining in the Homicide Unit for additional questioning?

A1: No

Q.2: Is this decision to remain in the Homicide Unit voluntary?

A.2: Yes

Q.3: Have you been threatened or coerced in any way in order to get you to remain in the Homicide Unit?

A.3: No

Q.4: Have you been advised of your Constitutional Rights prior to being questioned?

A.4: Yes

Q.5: Do you completely understand these rights?

A.5: Yes

Q.6: Have you been denied the use of the bathroom or telephone while in the Homicide Unit?

A.6: No

Q.7: Have you at any time requested an attorney be present while in the Homicide Unit?

A.7: No

From then until noon (approximately twelve hours), the appellant was left alone in the interview room. At noon, Detective Rhone entered the interview room and presented the appellant with a fifth Advice of Rights and Waiver Form. The form was reviewed, and the appellant signed it at 12:05 p.m. At 12:10 p.m., Detective Rhone presented the appellant with a second "Commissioner's Waiver," identical to the first.[4] The appellant signed it. The detective then began to interview the appellant about the murders, objects taken during the robbery, the murder weapon, and what Gordon was telling the detectives. Detective Rhone used a Nextel walkie-talkie to let the appellant hear what Gordon was telling another

---

**4.** The only difference between the forms is that the second form states, "You have been in the custody of the Prince George's County Police for over 24 hours[,]" instead of "for over 23 hours."

detective in another interview room. Gordon was admitting to involvement in the robbery and the murders and was implicating the appellant in those crimes.

At 1:07 p.m., Detective Rhone and the appellant began writing another statement. This third written statement was essentially the same as the appellant's second written statement, with a few exceptions. The appellant admitted that he had had a knife in his car, in the console between the two front seats, and that before the robbery he had shown it to Gordon, who took it. Gordon never returned the knife to him. The appellant described the knife and drew a picture of it. The appellant also said he did not know who Gordon was shooting at during the robbery and did not know if Gordon had taken any jewelry during the robbery. According to the appellant, when Gordon ran out of the animal hospital, he was carrying a black pocketbook. In the car, Gordon opened the pocketbook, took money out of it, and then threw the pocketbook out the window. In addition, at some point, Gordon told the appellant that the gun had been stashed in the woods near Colonel Circle.

The appellant's third written statement was completed at 4:40 p.m., and he was given food. He was left alone in the interview room until 5:30 p.m. Detective Turner entered the room at that point. He asked the appellant who he had told about his participation in the double homicide. The appellant said he had not told anyone. Detective Turner remarked that it was "a big burden to carry, that you participated in killing two people." The appellant shook his head and said "he wasn't proud of what he had done. That's something he wouldn't brag about."

Detective Turner exited the interview room at approximately 6:00 p.m. From then until 12:35 a.m. (August 11) (approximately 7 hours) the appellant was left alone. At that time, Detective Rhone and Detective Bergstrom entered the interview room [5] and escorted the appellant to the Commissioner's Office, for presentment.

---

5. Detective Bergstrom's first name does not appear in the record.

The appellant testified that he asked for a lawyer, but was denied one; was forced to write the statements and sign the waiver forms; was given water but was not allowed to sleep and was not given any food; only slept for "a couple of hours" during the entire time he was in the interview room; initialed the "Q & A" sections of all three written statements immediately before he was taken to the Commissioner; signed all of the Advice of Rights and Waiver Forms and all of the "Commissioner's Waivers" immediately before being taken to the Commissioner; was assaulted by two of the detectives; and wrote the statements only because he was afraid of more physical abuse.

On rebuttal, Detectives Rhone, Turner, and Hoffman denied that any of the events that the appellant had testified about had occurred.

On October 25, 2004, the motion court issued a memorandum opinion and order denying the motion to suppress. The court made factual findings that credited the testimony of the police officers and discredited the appellant's testimony. The opinion included a time-line of events that was consistent with the officers' testimony. The court found that all of the Advice of Rights and Waiver Forms and both of the "Commissioner's Waivers" were signed by the appellant voluntarily, with an understanding of his rights. The court further found that the appellant gave all of his statements without being physically threatened or assaulted and without any promises or rewards; and that he did not at any time request an attorney or that questioning be stopped.

The motion court determined that the entire period of delay was approximately 44 hours. It did not include in that period the approximately six hours immediately before the appellant was taken to the Commissioner, because he was not questioned during that time.

The motion court further found that the detectives were aware of the prompt presentment rule, as set forth in Maryland Rule 4–212. The court determined that "[a]t all relevant times, the delay in presentment was unnecessary[.]" It found

that the delay in presentment from 12:39 a.m. to 8:10 p.m. on August 9, 2000, was not solely for the purpose of eliciting a confession from the appellant but also was for the purpose of engaging in further investigation of the homicides and robbery. During that time, the police were investigating what objects were stolen from the scene, the location of the murder weapon, possible witnesses, the appellant's relationship with Gordon, and whether he had information about Gordon's use of firearms. Also, the detectives were attempting to have Gordon transferred to CID from Anne Arundel County, where he was in custody.

The motion court then found that the delay in presentment from 12:05 a.m. on August 10, to 12:35 a.m. on August 11, 2000, was for the sole purpose of eliciting incriminating statements from the appellant. Accordingly, the court was "required to apply heavy weight to this delay in presentment when evaluating the voluntariness of [the appellant's] written statement given to Detective Rhone [the third written statement] and his oral statement that 'he wasn't proud of what he had done' made to Detective Turner."

The motion court concluded that all four of the appellant's inculpatory statements were given voluntarily. With respect to the statements made during the "sole purpose for delay" period, the court applied very heavy weight to the delay in presentment, took into account the total circumstances, as set forth in its previous findings that reflected the officers' testimony about the events, and also took into account this Court's statement in our *Perez I* opinion that "a delay in presentment, even of the type that meets the heavy weight standard, cannot be the sole reason for finding involuntariness." 155 Md.App. at 31, 841 A.2d 372 (citing Md.Code (1973, 2002 Repl.Vol.), § 10–912 of the Courts and Judicial Proceedings Article ("CJP")).

**(B)**

The appellant contends the motion court erred in ruling that his inculpatory statements were voluntarily made, and there-

fore were admissible. His contention is three-fold. First, he maintains that the record does not support the court's finding that the delay in presentment from his arrival at the police station until 8:10 p.m. on August 9 was not solely for the purpose of eliciting a confession. He argues that, on the evidence presented, the court should have found that the delay in presentment was unnecessary, deliberate, and for the sole purpose of obtaining a confession. Second, he complains that the motion court did not recite the factors it found determinative in ruling that his inculpatory statements were voluntary. Finally, he argues that the evidence established that the "Commissioner's Waivers" were insufficient to advise him of the rights he was waiving, and therefore could not have produced a knowing and voluntary waiver of those rights; and that, in any event, the first such waiver was presented to him at hour 23 in custody, after his right to prompt presentment already had been violated, and therefore could not effect a valid waiver of that right.

The State responds that the motion court did not err in ruling the appellant's four statements to the police admissible. First, the record supports the court's finding that the delay in presentment up to 8:10 p.m. on August 9, was not solely for the purpose of eliciting a confession, and shows that the delay also was to allow for further investigation. Second, the court *did* recite the factors it found determinative in ruling that the statements were voluntary. Last, the "Commissioner's Waivers" were legally effective, especially when coupled with the appellant's testimony that he recently had been before a Commissioner and knew "all about" what a Commissioner is. It concludes that, under the totality of the circumstances, all four statements were voluntarily given.

## LAW OF CONFESSIONS

■ To be admissible in evidence, a confession must be voluntary under Maryland non-constitutional law, the due process clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and obtained in conformity with *Miranda v.*

*Arizona. Knight v. State*, 381 Md. 517, 531–32, 850 A.2d 1179 (2004); *Ball v. State*, 347 Md. 156, 173–74 and 178–79, 699 A.2d 1170 (1997); *Harper v. State*, 162 Md.App. 55, 71, 873 A.2d 395 (2005).

In a pretrial challenge to the admissibility of an inculpatory statement, the State bears the burden of proving, by a preponderance of the evidence, that the statement was given voluntarily. *Winder v. State*, 362 Md. 275, 306, 765 A.2d 97 (2001). Ordinarily, the voluntariness of a confession is assessed based on a totality of the circumstances test. *Id.* at 307, 765 A.2d 97. In determining the voluntariness of a confession under the total circumstances, "[w]e look to all of the elements of the interrogation to determine whether a suspect's confession was given to the police through the exercise of free will or was coerced through the use of improper means." *Id.* Included in the non-constitutional litany of factors to be considered are

> where the interrogation was conducted; its length; who was present; how it was conducted; whether the defendant was given Miranda warnings; the mental and physical condition of the defendant; the age, background, experience, education, character, and intelligence of the defendant; when the defendant was taken before a court Commissioner following arrest[;] and whether the defendant was physically mistreated, physically intimidated or psychologically pressured.

*Hof v. State*, 337 Md. 581, 596–97, 655 A.2d 370 (1995) (citations omitted).

## TRILOGY OF PRESENTMENT CASES

After the appellant's first trial and before we decided *Perez I*, the Court of Appeals filed three opinions on the same day holding that, in some circumstances, an unnecessary delay in presentment must be given "very heavy weight" as a factor in determining the voluntariness of a confession. In all three cases, the Court examined the interplay between Rule 4–212, first adopted in 1971, and CJP section 10–912, enacted in 1981

in response to the Court of Appeals's decisions in *Johnson v. State*, 282 Md. 314, 384 A.2d 709 (1978), and *McClain v. State*, 288 Md. 456, 419 A.2d 369 (1980), holding that any statement obtained after a delay in presentment of more than 24 hours was subject to a *per se* exclusionary rule.

Subsection (e) of Rule 4–212 states that an arrestee shall be presented to a District Court Commissioner "without unnecessary delay and in no event later than 24 hours after arrest."

CJP section 10–912, entitled "Failure to take defendant before judicial officer after arrest," provides:

(a) *Confession not rendered inadmissible.*—A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest within any time period specified by Title 4 of the Maryland Rules.

(b) *Effect of failure to comply strictly with Title 4 of the Maryland Rules.*—Failure to strictly comply with the provisions of Title 4 of the Maryland Rules pertaining to taking a defendant before a judicial officer after arrest is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession.

In *Williams v. State*, 375 Md. 404, 825 A.2d 1078 (2003), the defendant was arrested at 4:10 a.m. on July 30, 2000, on suspicion of robbery. He was bitten by a police dog during the arrest and so was taken to the hospital for treatment. He then was taken to the police station's robbery unit. At 9:25 a.m., he was placed in an interview room for an "initial interview." At 10:30 a.m., he signed an Advice of Rights and Waiver Form. He was questioned about and confessed to two robberies. He began a written statement about one of the robberies at 10:35 a.m.

When that statement was completed, the detective ran a computer check, which revealed that the defendant was using an alias. The detective was able to determine the defendant's true identity from a paystub taken from him when he arrived at the police station. A computer check using the defendant's

real name revealed that he was wanted in connection with three homicides.

At 11:40 a.m., the defendant began making a written statement about the second robbery.

At 1:13 p.m., the defendant was transported to the homicide unit. He waived his *Miranda* rights at 1:23 p.m. and confessed to the homicides. Another detective entered the interview room at 6:31 p.m. to take a written statement. The defendant waived his *Miranda* rights again at 6:38 p.m. He started writing a statement in which he confessed to the homicides, finishing at 8:40 p.m. He then was engaged in a question and answer session with the detective until 9:57 p.m.

At 9:58 p.m., the defendant began writing a 10-page statement about two of the homicides. He finished at 10:44 p.m. He was engaged in another question and answer session until 12:20 a.m. on July 31. He was left in the interview room overnight.

At 8:50 a.m., a detective entered the room to check on the defendant. The detective then left the room to read the defendant's previously written statements. He re-entered the interview room at 10:21 a.m., and began questioning the defendant about the homicides.

At 12:39 p.m., the police took the defendant for a drive to locate the home of one of his accomplices. They returned to the station around 12:50 p.m. The defendant made a photographic identification of the accomplice at 1:04 p.m. He then ate lunch and asked to speak to a detective he previously had spoken to.

At 3:39 p.m., that detective entered the room. The defendant admitted to concealing information about the murders from the police and agreed to provide another written statement, which he began writing at 4:08 p.m. That statement was completed at 5:51 p.m. He was taken for "processing" at 8:30 p.m. He was not taken before a Commissioner until 3:07 a.m. on August 1, some 47 hours after his arrest.

At all times during his detention, the defendant was permitted food, water, bathroom breaks, and cigarettes. He never asked for an attorney or invoked his right to remain silent. He never complained about his injuries. He never asked to stop the interrogation or to be taken promptly before the Commissioner.

The defendant was tried and convicted for murder. Before trial, he moved to suppress his written statements on the ground that they were involuntary. The Court of Appeals ultimately reversed the murder conviction, ruling that the three written statements about the homicides were involuntary.

The Court stated that the circuit court did not give appropriate weight to the violation of the delay in presentment in deciding voluntariness. It noted that, after the second written statement was completed, and after three hours of interrogation, the police had the basic information they needed to present the defendant to the Commissioner. Instead, they detained him for the purpose of obtaining incriminating statements.

The Court held that when a defendant is unnecessarily and deliberately detained in violation of his prompt presentment rights, solely for the purpose of obtaining an incriminating statement, a motion court must give that delay "very heavy weight in determining whether a resulting confession is voluntary." *Williams, supra,* 375 Md. at 434, 825 A.2d 1078.

The Court recognized that an arrestee may validly waive his right to prompt presentment. It noted that such a waiver form could be as easily standardized as an Advice of Rights and Waiver Form.

In *Hiligh v. State,* 375 Md. 456, 825 A.2d 1108 (2003), the defendant was taken to the police station at 10:58 p.m., on March 20, 1995, following a robbery investigation. Although he provided the police with the wrong name, they discovered his true identity. After he was identified by an eyewitness to one of the robberies, he was arrested.

The defendant was handcuffed to a one-foot cable connected to a wall in the interrogation room while the police prepared their charging documents. Those documents were completed by 3:30 a.m. The defendant remained in the room until 7:15 a.m., except for bathroom breaks, and was taken to the hospital to be treated for a minor head wound received after his refusal to follow police orders when he was apprehended. He was returned to the interrogation room at 8:35 a.m.

The defendant waived his *Miranda* rights and was questioned by the police, who were attempting to get background information and to "build a rapport" with him. On March 21, at 1:23 p.m., he made his first inculpatory statement. He made additional statements at 1:55 p.m.; 2:51 p.m.; 3:18 p.m.; 4:45 p.m.; and a later time not disclosed by the record.

By 6:00 p.m., the defendant had been turned over to detectives from two other counties in which he also was a robbery suspect. He was presented to a Commissioner at 10:30 p.m. on March 21, some 23 hours and 32 minutes after he first was brought to the station.

The defendant was allowed food, water, and bathroom breaks.

His defense attorney did not move to suppress the inculpatory statements as involuntary because of the delay in presentment. The statements were admitted at his trial, and he was convicted.

The defendant petitioned for post-conviction relief, on the ground of ineffective assistance of counsel. The postconviction court denied him relief. Ultimately, the Court of Appeals reversed.

The question before the Court was whether the defendant had introduced sufficient evidence to satisfy the prejudice prong of the test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Reciting language from *Williams, supra*, the Court noted that the police had all the information they needed to present the defendant to the Commissioner by 3:30 a.m. on March 21,

four and one-half hours after he was arrested. It concluded that any delay after that was unnecessary, deliberate, and for the sole purpose of eliciting an incriminating statement, and that the trial court therefore should have given the delay very heavy weight in its voluntariness determination. If it had done so, the trial court then might have suppressed the statement, or the jury might have found that it was involuntarily made. Accordingly, there was evidence on post-conviction that the trial counsel's failure to raise delaying presentment in a challenge to voluntariness of the defendant's statements was ineffective assistance of counsel of the type that created a substantial possibility that the outcome of the trial would have been different.

In *Facon v. State*, 375 Md. 435, 825 A.2d 1096 (2003), the defendant was arrested on robbery offenses in the District of Columbia during the evening hours of August 31, 1999. He waived extradition to Prince George's County and arrived there at 10:00 p.m. He was placed in an interview room. He was interviewed from 10:30 p.m. until 11:55 p.m. about general background information. He was left alone until 12:22 a.m. on September 1. He again talked to an officer about his general life background until 2:55 a.m. He was left alone again until 3:20 a.m. He then spoke to an officer until 4:25 a.m.

Another officer entered at 4:40 a.m. and discussed more general matters of the defendant's life. He was photographed from 5:55 a.m. until 6:35 a.m. The officer informed the defendant that he was finished talking about his life, and wanted to discuss the evidence against him. The defendant waived his *Miranda* rights at 7:14 a.m. He began to confess immediately, and finished his confession at 7:45 a.m. At 10:30 a.m., he was brought before the Commissioner.

The motion court found that the confession was knowingly and voluntarily made. The Court of Appeals ultimately reversed.

The Court rejected the defendant's argument that the calculation of the length of his detention for presentment delay purposes should have begun upon his arrest in the District of

Columbia. The Court held that the clock does not begin to run for presentment delay purposes until the defendant is present in Maryland. It calculated the presentment delay as 12 hours. The Court pointed out, however, that the time preceding his arrival in Maryland is a factor to be considered in a voluntariness determination.

Even so, the Court concluded that the delay was deliberate, unnecessary, and for the sole purpose of eliciting an incriminating statement. It noted that the defendant never waived his right to prompt presentment. The Court held that the trial court erred by assigning the delay no weight, when it should have assigned the delay very heavy weight. The Court remanded the case to the circuit court for a new trial.

## *ODUM*

In *Odum v. State,* 156 Md.App. 184, 846 A.2d 445 (2004), the defendant, a robbery suspect, was arrested at 11:00 a.m. on June 26, 2001. At 11:37 a.m., he was placed in an interview room. The principal investigating officer for the robbery was not present at the police station, but was informed about the arrest. He asked that the defendant be checked on and held until he could get to the station.

At 5:40 p.m., the investigating officer entered the interview room. He informed the defendant of the charges against him and photographed him. The officer left the room at 6:30 p.m.

At 6:52 p.m., another officer entered the room and obtained a *Miranda* waiver from the defendant.

Sometime between 8:21 p.m. and 9:10 p.m., the officer asked the defendant his whereabouts on the night of the robbery. The defendant replied that he had been in Virginia. No other questions were asked.

From 9:10 p.m. until 1:00 a.m. on June 27, the defendant was alone in the interview room.

Another detective then entered the room. He explained that he was investigating a murder. There was some general conversation about the defendant's background. At 2:00 a.m.,

the defendant again waived his *Miranda* rights. He gave a written statement to the detective between 2:00 a.m. and 4:00 a.m. The defendant remained in the interview room until 1:56 p.m. He then was taken to a holding cell near the Commissioner's hearing room, and was presented to the Commissioner at 6:12 p.m. The length of the delay was 30½ hours.

The motion court found that the confession was voluntarily given.

In deciding whether the motion court erred in admitting the statement, this Court reviewed the Court of Appeals's trilogy of delay in presentment cases and then set forth four categories of presentment delays, explaining the appropriate weight to be given each type.

The first type of delay is one that can have no effect on the voluntariness of a statement and is, therefore, immaterial to suppression. The second type of delay is necessary delay. We set forth examples of such delay:

" '(1) [T]o carry out reasonable routine administrative procedures such as recording, fingerprinting and photographing; (2) to determine whether a charging document should be issued accusing the arrestee of a crime; (3) to verify the commission of the crimes specified in the charging document; (4) to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value; (5) to obtain relevant nontestimonial information likely to be significant in discovering the identity or location of other persons who may be associated with the arrestee in the commission of the offense for which he was apprehended, or in preventing the loss, alteration or destruction of evidence relating to such crime.' "

*Odum, supra,* 156 Md.App. at 202, 846 A.2d 445 (quoting *Williams, supra,* 375 Md. at 420, 825 A.2d 1078 (quoting *Johnson, supra,* 282 Md. at 329, 384 A.2d 709)). Necessary delays do not violate the prompt presentment rule and do not weigh at all against voluntariness.

The third type of delay we dubbed a "Class I" delay. This is an unnecessary and deliberate delay that is not for the sole

purpose of obtaining a confession. Class I delays are to be weighed against voluntariness, but need not be assigned " 'very heavy' weight." *Id.* at 203, 846 A.2d 445.

The fourth type of delay is a "Class II" delay. This is an unnecessary and deliberate delay that violates the prompt presentment requirement and is for the sole purpose of obtaining a confession. A suppression court must weigh this type of delay " 'very heavily' against voluntariness." *Id.*

Finally, we recognized a fifth type of delay, one that is for the sole purpose of custodial interrogation, but during which no interrogation actually occurs.

We remanded the case to the circuit court for another suppression hearing in light of the trilogy of Court of Appeals cases addressing presentment delays.

### PEREZ I

In *Perez I,* the appellant argued the motion court erred in denying his motion to suppress his statements on the ground that they were involuntary. We vacated the judgments and remanded the case to the circuit court for a new suppression hearing and new trial. We directed the court to decide the amount of weight that should be given to the presentment delays in light of the trilogy of the Court of Appeals presentment cases; to make factual findings about the other relevant voluntariness factors; and to apply the totality of the circumstances test to determine if the confessions were voluntary.

We also discussed the issue of whether the appellant had waived his right to prompt presentment, so as to give guidance to the court on remand. We explained that the waivers should be considered as a factor in determining voluntariness. We recognized that, under *Logan v. State,* 289 Md. 460, 425 A.2d 632 (1981), and *Simkus v. State,* 296 Md. 718, 464 A.2d 1055 (1983), an arrestee may validly waive his prompt presentment rights.

We suggested that, if the motion court found that the "Commissioner's Waivers" were valid, an otherwise voluntary

confession made after a violation of the appellant's prompt presentment rights but also after a valid waiver of those rights "would not necessarily be tainted." *Id.* Finally, we commented that, "[t]o the extent that the effect of waivers in a situation like the one before us is unclear, it constitutes another reason why the suppression court, on remand, should review the issues *de novo.*" *Id.* at 35, 841 A.2d 372.

## STANDARD OF REVIEW

"[W]hether a confession was made voluntarily is a mixed question of law and fact." *Knight, supra,* 381 Md. at 535, 850 A.2d 1179. On review, we will not disturb the motion court's first-level factual findings unless they are clearly erroneous. *Wengert v. State,* 364 Md. 76, 84, 771 A.2d 389 (2001). We then "undertake a *de novo* review of the trial judge's ultimate determination on the issue of voluntariness." *Winder, supra,* 362 Md. at 310–11, 765 A.2d 97. In so doing, "we review the evidence in the light most favorable to the State" as the prevailing party. *In re Joshua David C.,* 116 Md.App. 580, 592, 698 A.2d 1155 (1997). Additionally, "[o]ur review of the propriety of the trial court's denial of a motion to suppress evidence is limited to the record developed at the motions hearing." *Wengert, supra,* 364 Md. at 84, 771 A.2d 389.

## THIS CASE: THE CLASS I DELAY

As stated previously, on remand, the motion court held a new suppression hearing, made specific findings of fact, and determined the weight to be accorded the presentment delays based upon the trilogy of Court of Appeals cases, the *Odum* decision, and our guidance in *Perez I.* It then applied the totality of the circumstances test and ruled that the appellant's three written and one oral statements were voluntary.

The appellant acknowledged some involvement in a robbery of the animal hospital at 9:28 a.m. on August 9, at hour nine of custodial detention. His first written statement started at 12:07 p.m. and was completed at 2:00 p.m. that day, at hour 14

of custodial detention. About an hour later, at 3:01 p.m., the appellant told Detective Hoffman that Gordon had fired a gun when they were in the animal hospital. His second statement, also in writing, was started at 3:31 p.m. and was completed at 5:01 p.m. the same day, at hour 17 of custodial detention.

The motion court found that the delay in presentment from the appellant's arrival at CID at 12:42 a.m. on August 9 to 8:10 p.m. on August 9 was a Class I delay, because it was not for the sole purpose of obtaining a confession. The appellant argues that the factual findings underlying that conclusion are clearly erroneous because they were not supported by evidence in the suppression hearing record.

We disagree. The motion court's finding that the 12:42 a.m. to 8:10 p.m. delay on August 9 was unnecessary and deliberate but not solely for the purpose of obtaining a confession is supported by the testimony of three of the detectives. The motion court cited their testimony in its memorandum opinion and order:

> Detectives Hoffman, Turner and Rhone testified that [during this delay period] they were also investigating what objects were stolen from the scene of the crime, the location of the possible murder weapon, the development of possible witnesses, [the appellant's] relationship to Gordon, and [the appellant's] knowledge of whether Gordon had ever fired a gun in [the appellant's] presence. The detectives were also attempting to have Gordon transported to CID from Ann [sic] Arundel County where he was detained.

The events that led to the appellant's arrest on August 9 are pertinent to whether, for the period beginning with his arrest and ending immediately after the completion of his second statement, the delay in presentment was solely for the purpose of obtaining a confession.

As mentioned previously, Keith Mahar told the police that the appellant and Gordon admitted committing the murders. Mahar did not act altruistically in doing so. He himself had been implicated in the murders by one Tony Fox, a jail-mate. Fox had told the police that Mahar had told him that he

(Mahar) and "a buddy" had committed the murders. When the police confronted Mahar with this information, he told them that he had overheard the appellant and Gordon discussing the murders. The finger-pointing by Fox and Mahar happened shortly before the police, using that information, applied for an arrest warrant for the appellant, but almost a year after the murders themselves.

Gordon matched the description Mrs. Tharpar gave of her assailant. The appellant's link to the murders, if any, thus depended upon his link to Gordon, if any. That is why, beginning at about 2:25 a.m. on August 9, the focus of the interrogation of the appellant was on whether and to what extent he knew Gordon. The appellant gave conflicting information about his relationship with Gordon. He did not name Gordon as a friend when questioned generally to obtain background information. He denied knowing a person with Gordon's name, and then identified a picture of Gordon as "Lucky."

Given the source of the information that the appellant had admitted being involved in the murders, it would not have been responsible for the police officers to charge him with the Tharpar murders until they had spoken to Gordon or obtained some other item of evidence linking the appellant to the crimes. During the breaks that took place in the interviews, the detectives spoke with other detectives involved in the investigation and tried to determine what jewelry, if any, had been stolen from Mrs. Tharpar, and whether a weapon or any other item had been recovered in connection with the crimes. They also arranged for Gordon to be transported to the Prince George's County CID from Anne Arundel County, where he was incarcerated. Gordon arrived at CID sometime between 11:00 and 11:30 p.m., after the appellant gave his first two statements. Accordingly, under the circumstances, we agree with the motion court's determination that the delay in presentment during this period was not for the sole purpose of obtaining an inculpatory statement from the appellant.

■ The appellant also argues that the motion court did not recite the factors it found determinative in deciding voluntariness. This argument lacks merit as well. In its memorandum opinion and order, the court referenced the factors that it considered, including the Class I delay, which it properly did not weigh very heavily against voluntariness in determining whether the appellant's first two written statements were voluntary. It considered the timetable of events incorporated into its memorandum opinion; that the appellant was 18 years old; that he had a tenth grade education; that he was able to read, write, and speak English; that approximately 90 days before his arrest, he had been before a Commissioner; that he was confined to the interview room, except for bathroom breaks; the size and description of the interview room; that the appellant was not under the influence of alcohol or drugs; that he freely signed four *Miranda* waivers; that the appellant was not physically threatened or harmed or given inducements to make the incriminating statements; that the detectives were aware of the prompt presentment rule; and that the appellant did not ask for an attorney or to stop the questioning. Contrary to the appellant's contentions, the motion court's time-line of events shows that it also considered the length of the interrogations and the periods of time in which the appellant was able, or not able, to sleep.

■ As stated previously, the court's first-level factual findings are supported by the record and are not clearly erroneous. Accepting those facts, and reviewing *de novo* the issue of the voluntariness of the two statements the appellant gave during this Class I delay, we hold that, under the totality of the circumstances, the statements were made voluntarily.

The appellant's age and educational level supported his being able to freely determine whether to speak. He communicated intelligently with the detectives and had no difficulty understanding them. He was not impaired by drugs or alcohol. While he was not given a lengthy period in which to sleep, he slept for three hours total before he gave his first statement. He was not deprived of food, water, or bathroom

breaks. He was not physically assaulted or harmed. He freely waived his *Miranda* rights more than once. He was not taken for presentment, but, as explained, that delay was not solely to obtain a confession.

## THIS CASE: THE CLASS II DELAY

■ The appellant presents two arguments about the motion court's finding that his written and oral statements given during the Class II delay were voluntary. First, he argues that the motion court did not specify the factors it found determinative in finding voluntariness. Second, he argues that the court erred in concluding that he knowingly and voluntarily waived his prompt presentment right by executing the "Commissioner's Waivers."

■ The motion court did in fact list the factors that it considered in determining whether the appellant's third written statement and his oral statement were given voluntarily, and so the appellant's first argument lacks merit. We agree with the appellant's second argument, however, that the motion court erred in finding that the appellant knowingly and voluntarily waived his prompt presentment right.

■ "[A] defendant may specifically waive his right to prompt presentment, provided such waiver is knowingly and intelligently made." *Johnson, supra,* 282 Md. at 332, 384 A.2d 709. *See also Logan, supra,* 289 Md. at 470, 425 A.2d 632 (holding that "knowing, intelligent and voluntary waiver standard set out in *Johnson v. Zerbst,* [304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938),] is the one to be met for an effective waiver of the requirement of a prompt initial appearance"). In *Williams, supra,* the Court explained the entitlements an arrestee should be told about to effectively waive his prompt presentment right:

> [T]hat the Commissioner is a judicial officer not connected with the police, and that the Commissioner, among other things, will inform the accused of each offense with which he or she is charged, including the allowable penalties attached to those charges, furnish the accused with a written copy of

the charges, advise the accused of his or her right to counsel, make a pre-trial release determination, and if, as here, the accused has been charged with a felony beyond the jurisdiction of the District Court, of his or her right to a preliminary hearing before a judge.

375 Md. at 432, 825 A.2d 1078. The *Williams* Court stated that an arrestee could validly waive his prompt presentment right "if this kind of advice is properly given and a proper waiver of the right to presentment in conformance with the Rule is obtained...." *Id.* at 433, 825 A.2d 1078.

Here, the only written explanation of the prompt presentment right given to the appellant during the entire time he was in custody is what was set forth in the "Commissioner's Waivers." There was no evidence that any of the investigating officers gave the appellant an oral explanation of his prompt presentment right. What is stated in the "Commissioner's Waivers" was not sufficient to advise the appellant of all of his rights with regard to prompt presentment. The written waiver form stated only, "You have been in the custody of the Prince George's County Police for over 23 [or 24] hours. You have a right to be presented before a District Court Commissioner within 24 hours of your apprehension." The form did not advise the appellant of any of the information he needed to know in order to intelligently waive his prompt presentment right.

Notably, before the General Assembly enacted the bill now codified at CJP section 10–912, "*Johnson* Waivers" or "Commissioner's Waivers" were commonplace, and laid out all of the prompt presentment advice later set forth by the *Williams* Court. *See Simkus,* supra, 296 Md. at 729–31, 464 A.2d 1055; *Logan, supra,* 289 Md. at 475–76, 425 A.2d 632. Under those circumstances, the Court of Appeals in those cases held that the waivers were valid. Further, it is well established in Maryland that a *Miranda* waiver does not also operate to waive prompt presentment rights. *See Williams, supra,* 375 Md. 404, 825 A.2d 1078; *see also Johnson, supra,* 282 Md. at 332, 384 A.2d 709.

In *Perez I,* we observed that there might be additional evidence, not introduced at the first suppression hearing because its relevance only was clear after the trilogy cases were decided, that would be pertinent to whether the waivers were valid. We stated:

> It is not clear whether [the appellant] was given a copy of the charging document, application, or arrest warrant or, if so, when. It is not clear whether one or more of those documents contained a statement of a right to be presented to a judicial officer. It is unknown whether [the appellant] was orally advised of his right to prompt presentment other than when he executed written waivers expressly referring to that right.

*Perez, supra,* 155 Md.App. at 34, 841 A.2d 372. The record of the suppression hearing on remand discloses that there was no such evidence, however.

The motion court relied upon the evidence that the appellant had been before a Commissioner about 90 days before his arrest in this case in finding that he knowingly and intelligently waived his prompt presentment right. That evidence was legally insufficient to support a finding that the appellant waived his prompt presentment right knowingly. Although there are no Maryland cases directly on this point, we find guidance in cases addressing *Miranda* waivers and waivers of the right to counsel under Rule 4–215. *See Miranda v. Arizona, supra,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (*Miranda* warnings must be given regardless of whether a defendant is aware of his rights); *Johnson v. State,* 355 Md. 420, 735 A.2d 1003 (1999) (insufficient if Rule 4–215 rights given by district court judge at bail review or by Commissioner; rights were required to be given by circuit court judge, and therefore waiver was not knowing and voluntary); *Moten v. State,* 339 Md. 407, 663 A.2d 593 (1995) (insufficient that defendant knew his Rule 4–215 rights and was provided a copy of charging document; his waiver of those rights was not knowing because they were not given by the circuit court judge). The caselaw makes clear that the appellant's prior

experience with the Commissioner some 90 days before he was arrested was insufficient to render his waiver knowing.

Accordingly, as a matter of law, the appellant's waiver of his prompt presentment right was not effective.[6]

We accept the motion court's findings of fact that the delay from 12:05 a.m. on August 10 to 12:35 a.m. on August 11 was a Class II delay because it was unnecessary, deliberate, and for the sole purpose of eliciting a confession. That finding was supported by the evidence in the suppression hearing record. We must also conduct a *de novo* determination of the voluntariness of the appellant's statements made during this time. In accordance with the above analysis, we will not factor in the "Commissioner's Waivers," as they were not valid.

After the appellant signed the first invalid "Commissioner's Waiver," at shortly after midnight on August 10, he was left in the interview room. Twenty-four hours already had passed since he was taken into custody. The appellant was left in the interview room for the next 12 hours. There was no evidence that he was told before then how long he would be kept in the interview room, or what was to happen to him next. There was no evidence that anyone looked in on him during that time, or that he had a means to communicate with others if he wished to do so.

The next contact the police had with the appellant was to present him with another invalid "Commissioner's Waiver." They then had him listen in as Gordon admitted his own involvement in the Tharpar murders and the appellant's involvement as well. When the appellant began giving his third

---

6. We note that in *Williams, supra,* the Court of Appeals explained that, even with a valid waiver of prompt presentment rights, the delay must be reasonable and, "absent some truly *extraordinary circumstance,* we would not expect any delay incurred for purposes of interrogation to extend beyond [24 hours]." *Williams, supra,* 375 Md. at 433 n. 4, 825 A.2d 1078. We find it unnecessary to address the appellant's argument that he could not validly waive his prompt presentment rights because they already had been violated, however.

written statement, at 1:07 p.m. on August 10, he had been confined for over 36 hours. He completed that written statement at hour 41 + of custodial detention. The appellant's oral statement to Detective Turner was made at hour 42 + of custodial detention.

On the State's evidence at the suppression hearing, for the second 24 hours in which the appellant was confined, he was given food only once and was not given water or taken to the bathroom.

By the time the appellant gave his third written statement, completed at hour 41 +, and his oral statement, Gordon had been in custody at CID for hours, and had implicated himself and the appellant in the Tharpar murders. The police had adequate information to charge him with the murders during most if not all of the second 24 hours in which he was confined.

These facts, viewed in totality, cannot support a conclusion that the appellant's third and fourth statements were voluntarily obtained. By the time those statements were given, the length of the appellant's detention was inordinate; the police had no reason not to present him to the Commissioner, except to obtain incriminating statements from him; he had been ignored and kept in what amounted to solitary confinement for many hours; and he was not given water and was fed only once. Without valid waivers of his right to presentment, with heavy weight accorded to the delay, with the prolonged length of the delay, and with the conditions of confinement for the last 24 hours, the State cannot have met its burden of proving that the statements made during that time were the product of the appellant's free will.

## SUMMARY

On retrial after remand, the appellant's first two written statements (the first completed at 2:00 p.m. on August 9, 2002, and the second completed at 5:01 p.m. that day) are admissible in evidence. The jury must determine whether the State has proven beyond a reasonable doubt that the statements were voluntary. In so deciding, the jury must determine whether,

at the times the statements were given, there was a delay in presentment that was unnecessary, deliberate, and for the sole purpose of obtaining a confession. If so, the jury must give the delay in presentment very heavy weight in its voluntariness decision.

The appellant's third written statement (completed at 4:40 p.m. on August 10, 2000) and his oral statement to Detective Turner (made at 5:30 p.m. that day) are not admissible in evidence.[7]

## II.

The appellant next contends the trial court's instruction to the jury on the issue of the voluntariness *vel non* of the appellant's statements was in error. One aspect of this contention may recur on remand, and so we shall comment on it briefly.

The trial court instructed the jury as follows:

In deciding whether the statement was voluntary, consider all of the circumstances surrounding the statement, including the conversations, if any, between the Police and the Defendant; whether the Defendant was warned of his rights; the length of time that the Defendant was questioned; who was present; the mental and physical condition of the Defendant, whether the Defendant was subjected to force or threat of force by the Police; the age, the background, the experience, the education, character and intelligence of the Defendant and whether the Defendant was taken before a District Court Commissioner, without unnecessary delay, following the arrest, and if not, whether that affected the voluntariness of the statement.

*I'm going to give you a copy of the law that deals with confessions.* A confession may not be excluded from evidence solely because the Defendant was not taken before a

---

7. There is no issue as to derivative tangible evidence obtained as a result of the inadmissible statements, because there was no such evidence.

Judicial Officer after arrest within a time period specified by Title IV of the Maryland Rules.

*Title IV of the Maryland Rules, Ladies and Gentlemen, states that after a person has been arrested, they must be taken, without unnecessary delay, before a District Court Judicial Officer. That happens to be defined as a District Court Commissioner. Goes on to say that failure to strictly comply with the provisions of Title IV, that's the twenty-four hour rule pertaining to taking the Defendant before a Judicial Officer after arrest, is only one of the factors among others to be considered by the Court in deciding whether there was voluntariness and the admissibility of a confession.*

In determining the voluntariness of a statement, you must determine whether any delay in bringing the Defendant to the Commissioner was unnecessary, deliberate and for the sole purpose of obtaining a confession. If you find that it was, you should give this factor very heavy weight in determining voluntariness. You should consider whether the Defendant waived his right to prompt presentment. If he did waive such right, you do not then give this factor very heavy weight in determining the voluntariness.

Unnecessary delay in bringing the Defendant to the Commissioner is but one of the factors that you should consider in determining whether the Defendant's statements were voluntary.

You should determine the voluntariness of each statement independently, and you should also consider any other circumstances surrounding the taking of the statement.

If you find, beyond a reasonable doubt, that the statement was voluntary, you give it such weight as you believe it deserves. If you do not find, beyond a reasonable doubt, that the statement was voluntary, you must disregard it.

(Emphasis added.)

The appellant complains that the reference to the "twenty-four hour rule" created the impression that an "unnecessary

delay" must be a delay of at least 24 hours, which is an incorrect statement of the law.

We agree that the trial court's instruction about Title IV of the Maryland Rules, as given, was confusing and could have been heard to mean that only a delay beyond 24 hours is an unnecessary delay. The trial judge appears to have been reading parts of the rule, and injecting his own comments as to its meaning as he was doing so. We have scoured the record and cannot determine whether the trial judge gave the jury a copy of Rule 4–212, as one of his remarks during instructions suggested he was going to do. In any event, on remand, an instruction about delay in presentment as a factor in the voluntariness of an inculpatory statement should be carefully worded so as not to suggest that a delay only is unnecessary if it is beyond 24 hours. Indeed, any reference colloquially to the "twenty-four hour rule" is inadvisable.[8]

## III.

The appellant's third contention also is likely to recur on remand. It concerns the trial court's ruling granting the State's motion *in limine* to preclude the defense from introducing evidence of an allegedly "false confession" to the Tharpar murders given by one Antonio Meyers. The defense had sought to elicit evidence of Meyers's "false confession" on

---

**8.** We shall repeat what we said on this subject in *Perez I:*

In this case, where the delay exceeds 24 hours, it seems advisable to include the 24 hour provision [in the jury instructions]. When the delay is less than 24 hours, however, it should not be given if, in the context of the trial, it would mislead the jury into believing the State has at least 24 hours. If it is given, care should be taken to explain that the State is not automatically entitled to 24 hours.

155 Md.App. at 37–38, 841 A.2d 372.

Because we have held that the appellant's last two statements were involuntary as a matter of law, in a jury trial on remand, the jurors only will be determining the voluntariness of the appellant's first two statements, which were given before 24 hours passed. As we pointed out in *Perez I*, when that is the situation, it is especially important that the jury not be made to think that only a delay beyond 24 hours is an unnecessary delay.

cross-examination of Detective Hoffman and by calling Meyers to the stand. The court ruled that it could not do either.

## (A)

After his first trial, the appellant filed a motion for new trial on the basis, among others, of "newly discovered evidence" that Meyers had confessed to the Tharpar murders. Defense counsel argued that Meyers's confession, if true, was exculpatory evidence, and, if untrue, was relevant to show the *modus operandi* of the Prince George's County police officers in interrogating suspects and obtaining confessions.

An evidentiary hearing was held on the appellant's motion for new trial. The defense called Detective Robert Frankenfield, who was the lead detective in the case of the Tharpar murders; Detective Hoffman; Isaiah Fordyce; Chris Conway; and Antonio Meyers. The State did not call any witnesses.

The evidence adduced at the new trial hearing showed the following. Meyers was a suspect in several robberies and burglaries in the Hyattsville area. On January 17, 2000, two detectives drove Meyers around that area so he could point out the locations of the crimes he had committed. The detectives contacted Detective Hoffman to tell him what they were doing. Detective Frankenfield happened to be with Detective Hoffman when he received the call, and realized that the area in which Meyers had been committing robberies and burglaries was near the animal hospital. For that reason, Detective Hoffman suggested that it would be a good idea to question Meyers about the Tharpar murders.

Meyers was brought to the station house for questioning. After waiving his *Miranda* rights, he was interrogated by Detectives Frankenfield and Hoffman, and by Detective Conto,[9] one of the detectives who had been driving him around. Meyers told the detectives that, about five or six months earlier, he, one Thomas Martin, and one Virgil White had planned and carried out a robbery. Meyers was a "look-out."

---

**9.** Detective Conto's first name does not appear in the record.

Meyers said that, when he was driving around with the two detectives, they discussed another robbery that he had not been involved in. He then changed his story and said that he had participated in that robbery as well, and that a person had been shot and killed during that robbery. He implicated White, Martin, Fordyce, and a person named "Midnight" in the crime.

At that point in the interview, Detective Frankenfield thought Meyers might be talking about the Tharpar murders, and asked him follow up questions with that in mind. Meyers could not describe the crime scene of the Tharpar murders. He did not know the address of the animal hospital. He said that the weapons used in the murder he was talking about were .38 and .45 caliber handguns. (The handgun used in the Tharpar murders was a .22 caliber firearm.) He did not know the weather on the day of the crimes, which had been a crucial fact in the Tharpar murders. (It was raining heavily when the Tharpar murders took place.) Meyers said that he would give a written statement, and was left alone to do so. He changed his mind, and never gave a written statement. Meyers never specifically admitted to involvement in the Tharpar murders.

After Meyers had been left alone, Detective Conto entered the interview room. The detective exited a short time later and told Detective Frankenfield that Meyers "had made the whole thing up."

All three detectives then entered the interview room. Detective Frankenfield asked Meyers why he would implicate himself in a crime he was not involved in. Meyers explained that "people in jail told him that if he cooperated with the police, that they would cut him a break." Meyers then said that he was in Tennessee on September 15, 1999, the date of the Tharpar murders. Detective Frankenfield later verified that Meyers in fact was in Tennessee on that date.

The detectives denied that any force, threats of force, or promises were made to Meyers during the interrogation. Detective Frankenfield took notes during the interrogation, which were admitted into evidence. Meyers was not charged

in the Tharpar murders, as it was clear that he could not have committed them. Detective Frankenfield did not question the people who Meyers named during the interrogation, other than to ask Conway about the appellant and Gordon. He had, however, run fingerprints on Fordyce, Meyers, and Martin, at the State's request. The fingerprints came back negative in comparison to the Tharpar crime scene fingerprints. Detective Frankenfield was out of the country when the appellant and Gordon were questioned.

Detective Hoffman testified that he did not take any notes during the interrogation of Meyers.

Defense counsel introduced into evidence an affidavit by Conway, in which he swore that a man named Roger Tasker had told him, after the appellant's sentencing, that the police had threatened him in order to implicate the appellant. The State introduced a competing affidavit from Tasker, in which he denied what was in the other affidavit.

Meyers testified that, while he was being interrogated, Detectives Frankenfield and Hoffman hit him in the chest and the back of the head. They also caused him to "fall back into the chair." He claimed that he was kept in custody for 30 hours. He also claimed that the detectives made accusations and threats against him. He said that he admitted having knowledge about the Tharpar murders and that he did so out of fear; he really did not know anything about the crimes. He testified that he was in Tennessee when the Tharpar murders happened. He also testified that he had been diagnosed with paranoid schizophrenia.

The court took the new trial motion under advisement. On July 19, 2002, it issued a memorandum opinion and order denying the motion. The court found that some of the statements identifying the Tharpar murderer fit the "mysterious and elusive 'Midnight,' " but also fit the description of Gordon. The court found that Meyers's statement to the police about the murders was fabricated, and in any event was not a true confession. The only crimes that Meyers actually confessed to were some breakings and enterings in the Landover Hills

area. Even in his oral statements to the detectives, he denied being involved in the Tharpar murders.

### (B)

Now, on appeal from the judgments of conviction in his second trial, the appellant makes a three-fold argument about the evidence of Meyers's "false confession." First, he maintains that the court erred in refusing to hold an evidentiary hearing before ruling on the State's motion *in limine*. *See Leeks v. State*, 110 Md.App. 543, 557, 678 A.2d 80 (1996) (holding that an on-the-record evidentiary hearing is necessary when the trial court "is asked to rule *in limine* that a witness cannot be asked questions" to show that he is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely). Second, he argues that the court erred in refusing to permit him to cross-examine Detective Hoffman at trial about the "false confession." Finally, he asserts that the court erred in ruling that he could not call Meyers to testify at trial.

The State responds that the court was not required to hold a *Leeks* hearing because it held an on-the-record evidentiary hearing on the same exact issue in the course of deciding the appellant's motion for new trial. It also argues that the court did not err in refusing to allow any evidence of Meyers's "false confession" because it would have confused the jury and "resulted in the proverbial 'trial within a trial.' "

The same trial judge presided over the appellant's first and second trials. Prior to ruling on the State's motion *in limine* concerning Meyers's "false confession," the judge reviewed the transcripts of the evidentiary hearing on the motion for new trial (which he had presided over). In ruling on the motion *in limine*, the trial judge remarked that the hearing on the new trial motion had been a full evidentiary proceeding at which the appellant had been represented by counsel and at which all of the witnesses who had had anything relevant to say about Meyers's "false confession," and the circumstances leading up to it, had testified. The trial

judge concluded that that evidentiary hearing furnished him with all the information necessary to rule on the motion *in limine,* and that holding another hearing on the same issue was not necessary.

The trial court did not err in declining to hold a *Leeks* hearing on the State's motion in limine. There was no proffer by either party of any additional relevant evidence, beyond that which was adduced at the new trial evidentiary hearing, that the court needed to consider in order to rule intelligently on the motion *in limine.* There was no reason for the trial court to think that it did not have all the information it needed to make an intelligent ruling, and it does not appear that any such additional information existed.

 The trial court first granted the motion *in limine* with respect to any testimony by Meyers. The court observed that there were many pieces of information about the Tharpar murders that Meyers did not know, and that the appellant did know. The court found that Meyers's statements to the police, to the extent they concerned the Tharpar murders at all, were fabricated. The court discredited all of Meyers's testimony about how the interrogation was conducted. Finally, it concluded that Meyers's testimony was not probative and would mislead the jury.

The trial court further granted the motion *in limine* with respect to cross-examination of Detective Hoffman about the Meyers "false confession." The court rejected defense counsel's argument that evidence of the circumstances surrounding the "false confession" was proper impeachment evidence, because it tended to undermine Detective Hoffman's testimony that the appellant's confessions were not obtained by use of force, threats, or improper police pressure.

On appeal, the appellant argues that cross-examination of Detective Hoffman about the Meyers "false confession" should have been allowed, because it "bore on Detective Hoffman's bias and motivation to testify falsely and otherwise went to his credibility[ .]" He maintains:

A jury could conclude [from evidence about the Meyers "false confession"] that Detective Hoffman had an interest in the outcome of the case in that he had already coerced a confession out of an innocent man and had an interest in avoiding detection of a second false confession. Certainly, were the jury to find the statements he took to be involuntary and acquit the appellant, this would cast doubt about his method of interrogation. Additionally, the very fact he obtained a false confession suggests dishonesty, especially given the fact that Meyers, had he been permitted to testify, would have said Detective Hoffman and Detective Frankenfield beat it out of him.

The appellant cites *Mulligan v. State,* 18 Md.App. 588, 308 A.2d 418 (1973), and Maryland Rules 5–404(b) and 5–608(b), in support of his argument on this point. He also argues that the court abused its discretion in not permitting the defense to call Meyers to the stand, saying that the ruling violated his due process right to present a defense.

Rule 5–404(b) generally prohibits the use of evidence of prior bad acts by a person to prove propensity, but allows the use of such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident." Rule 5–608(b) allows impeachment of a witness regarding his "own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness." If such evidence is objected to, "the court may permit the inquiry only if the questioner . . . establishes a reasonable factual basis for asserting that the conduct of the witness occurred." Also, "[t]he conduct may not be proved by extrinsic evidence."

Finally, Rule 5–616(a) provides that a witness may be impeached on examination by questions directed at "[p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely"; and at "[p]roving the character of the witness for untruthful-

ness by ... establishing prior bad acts as permitted under Rule 5–608(b)...."

In *Mulligan v. State, supra,* 18 Md.App. 588, 308 A.2d 418, the defendant was on trial for the murder of his eight-month-old child. The appellant gave an oral confession to an interrogating police officer. Prior to trial, the State moved *in limine* to preclude the defense from questioning the police officer about his having been found guilty in a police trial board disciplinary proceeding of filing false reports in another case. The court granted the motion.

On appeal after conviction, this Court held that the trial court had abused its discretion in ruling that the defense could not question the officer about his past professional misconduct. Quoting 3A Wigmore, *Evidence,* § 983 (Chadbourn rev.1970) (in turn quoting *Territory v. Chavez,* 8 N.M. 528, 531, 45 P. 1107 (1896)), we stated that a witness can be impeached on cross-examination "upon specific acts and transactions of his past life; and if they are not too remote in time, and clearly relate to the credit of the witness, in an important and material respect, it would be error to exclude them." *Mulligan, supra,* 18 Md.App. at 593–94, 308 A.2d 418 (quotations omitted). We observed that cross-examination of this sort

"is subject to a discretionary control by the trial judge. Some of the factors, in addition to those of undue humiliation and unfair prejudice, ... which may, it seems, sway discretion, are (1) whether the testimony of the witness under attack is crucial or unimportant, (2) whether the misconduct inquired into is relevant to truthfulness, such as false swearing, fraud and swindling, or bears only on 'general bad character' such as acts of violence or unchastity, (3) the nearness or remoteness of the misconduct to the time of trial, and (4) whether the matter inquired into is such as to lead to time-consuming and distracting explanations on cross-examination or re-examination."

18 Md.App. at 595, 308 A.2d 418 (quoting Charles T. McCormick, *Handbook of the Law of Evidence,* § 42 (1954)). We noted, moreover, that impeachment by proof of prior miscon-

duct not the subject of a conviction is limited to cross-examination, and not subject to proof by extrinsic evidence. "Thus, if the witness denies the misconduct, the examiner ... may not call other witnesses to prove it." *Id.* (quoting McCormick, *supra,* at § 42).

In the case at bar, the appellant's objective on cross-examination of Detective Hoffman was to discredit him by proof of prior misconduct, namely that he had used physical force, threats of force, and other undue coercion to interrogate Meyers for the purpose of obtaining a confession. Unlike in *Mulligan,* in which there was *evidence* in the form of the police trial board determination that the police officer had engaged in prior misconduct, in this case there was merely an *allegation*—by Meyers—that Detective Hoffman had engaged in misconduct.

The factual bases the defense had for asserting that the misconduct had happened was Meyers's testimony at the evidentiary hearing on the new trial motion that it had happened and the fact that Meyers gave a false confession. The court already had found that Meyers's testimony was not credible. The evidence was highly questionable as to whether Meyers indeed confessed to the Tharpar murders. He never specifically said that he was involved in them and was not able to give any information that showed that he had any knowledge of the details surrounding them. The most specific confession Meyers made was to being involved in a robbery in the Hyattsville area in which a person was shot and killed.

On this state of the evidence, the court was entitled to find, under Rule 5–608(b), that there was not a reasonable factual basis for the defense's assertion that Detective Hoffman "beat up" Meyers to extract a confession to the Tharpar murders, and thus that impeachment of Detective Hoffman by examination about the alleged misconduct was not permissible.

Moreover, unlike the police officer in *Mulligan,* Detective Hoffman *denied* that he had engaged in any misconduct in his interrogation of Meyers. Detective Hoffman's denial was established in his sworn testimony at the hearing on the

motion for new trial. There was no reason for the trial court to think that Detective Hoffman would testify differently if asked on cross-examination at trial about his interrogation of Meyers. Under Rule 5–608(b), the misconduct that a party seeks to use for impeachment of a witness by his own prior conduct not resulting in a conviction may not be proved by extrinsic evidence. Thus, upon Detective Hoffman's denial that he engaged in misconduct in interrogating Meyers, such misconduct could not be proven through another witness—including Meyers himself. Accordingly, the trial court did not abuse its discretion in precluding the appellant from cross-examining Detective Hoffman about his participation in the Meyers interrogation or in precluding the appellant from calling Meyers to testify about his interrogation by Detective Hoffman.

## IV.

The appellant's last contention challenges a ruling by the court on a sequestration violation by the defense. We shall not address this issue because it is unlikely to recur on remand.

**JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**