4 A.3d 96

**Khiry Montay MOORE**

v.

**STATE of Maryland.**

**No. 1737, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Sept. 3, 2010.

332

Allison P. Brasseaux (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Cathleen C. Brockmeyer (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: HOLLANDER, ARRIE W. DAVIS (Retired, Specially Assigned), LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

ARRIE W. DAVIS, J. (Retired, Specially Assigned).

Appellant, Khiry Montay Moore, was convicted by a jury in the Circuit Court for Prince George's County of first-degree felony murder, involuntary manslaughter, conspiracy to commit robbery, three counts of attempted robbery with a dangerous weapon and three counts of use of a handgun in the commission of a crime of violence. Appellant appeals his convictions and presents the following questions:

I. Did the trial court err in denying appellant's motion to suppress his confession?

II. Did the prosecutor engage in improper and prejudicial closing argument when he called [appellant] a "cold-hearted thug" and a "gangster"?

III. Did the trial court err in failing to merge appellant's sentence for attempted robbery with a dangerous weapon with the first-degree felony murder conviction?

IV. Did the trial court err in sentencing appellant for first-degree felony murder instead of involuntary manslaughter?

For the reasons that follow, we answer the first, second and fourth questions in the negative. We answer the third question in the affirmative. Accordingly, we affirm appellant's convictions, but merge the conviction for attempted robbery.

## PROCEDURAL AND FACTUAL BACKGROUND

Appellant was charged with first-degree murder, attempted robbery with a dangerous weapon, use of a handgun in the commission of a crime of violence and other related offenses arising out of the attempted robbery and murder of Maurice Powell and the attempted robbery of Powell's two friends, Thomas Gilbert–Turner and Tyrelle White. On March 11, 2007, Powell, Gilbert–Turner and White went to see a movie in Georgetown and took the Metro home to Prince George's County. They got off at the Addison Road Metro Station at approximately 1:00 a.m. and began walking toward Powell's home. As the three passed the Central Gardens Apartments, they noticed a group of four or five people begin to follow them.

They crossed the street and the group continued to follow them. They planned to run to Powell's home once they reached the top of the hill on Daimler Drive. A member from the group that was following yelled, "hey, hey" and then Gilbert–Turner and White heard three shots. They ran to Powell's home and told his father that they had been shot at

and they did not know what happened to Maurice. Powell's father found his son lying in the street. He was pronounced dead by emergency crews when they arrived on the scene.

Charles Dutch, a co-defendant who testified pursuant to a plea agreement, explained that some members of the group were drinking that evening in the apartment complex when they observed Powell and his friends walk by. According to Dutch, another co-defendant, Steve Scott, said "You seen [sic] them three dudes right there, they look fresh, let's go rob them." [1] Dutch testified that appellant and Scott led the group toward Powell and his friends. Dutch heard two gunshots and ran. Afterward, Dutch heard another co-defendant, Tavon Burke, ask appellant if he shot Powell and appellant admitted that he did, "on accident."

Appellant was arrested on March 21, 2007 at approximately 1:00 a.m. He was taken to police headquarters, where he was interrogated and ultimately confessed. Appellant moved to suppress his confession, which the trial court denied. The videotape of his confession was played for the jury and, as noted, he was convicted of first-degree felony murder, involuntary manslaughter, conspiracy to commit robbery, three counts of attempted robbery with a dangerous weapon and three counts of use of a handgun in the commission of a crime of violence.

## LEGAL ANALYSIS

### I

■ Appellant initially contends that the trial court erred in denying his motion to suppress his confession made while in police custody, which he claims was involuntary as a result of the delay in prompt presentment to a Court Commissioner, a requirement pursuant to Maryland Rule 4–212(e). The following evidence was presented at the suppression hearing.

---

1. Dutch explained that "fresh" meant that they appeared to have money because they were wearing nice clothes and shoes.

On March 21, 2007, Corporal James Seger was patrolling the Cindy Lane area of Prince George's County while working for the Special Assignment team. He pulled into an apartment complex and observed a group of young people standing outside. When they saw his police cruiser, they walked away. Because it was 1:00 a.m., Corporal Seger stopped them, suspecting curfew violations. Appellant was among the group. Corporal Seger learned that there was an outstanding warrant for appellant's arrest stemming from a homicide. Appellant was arrested pursuant to the warrant at 1:09 a.m. and taken to the homicide section of the Prince George's County Police Department. They arrived between 1:40 a.m. and 2:00 a.m. Corporal Seger placed appellant in an interview room, pursuant to the instructions of the homicide division. Corporal Seger did not engage in any questioning of appellant at that time. He simply searched appellant, removed his handcuffs and left him in the room.[2]

Thereafter, Detective David Morissette, who was working the night shift that evening, called Detective Robert Turner, the lead investigator in the case. Detective Turner instructed Detective Morissette to begin talking to appellant. Accordingly, Detective Morissette entered the interview room shortly after 2:00 a.m. and read appellant his *Miranda* rights. Appellant initialed beside each advisement and agreed to waive his rights. Detective Morissette began to collect background information from appellant at that time. He learned that appellant was sixteen years old, was in the ninth grade and had previously been arrested for theft or unauthorized use of a motor vehicle.

Subsequently, at 2:41 a.m., Detective Timothy Cordero entered the interview room and questioned appellant until 3:05 a.m. He testified that he entered the room in order to collect "some preliminary background information" for his partner, who was the lead investigator on the case. Detective Cordero presented appellant with photographs of his co-defendants and

---

**2.** Corporal Seger testified that there was a wall hand-cuff in the room, but that he did not recall handcuffing appellant to the wall.

asked appellant if he recognized the individuals. Appellant stated that he did not recognize them. Detective Cordero then presented appellant with the arrest warrant and informed appellant that he was being charged as an adult with murder as a result of the incident that took place on Daimler Drive. At that time, appellant asked to call his mother. Detective Cordero denied his request and informed him that he was going to obtain a search warrant for appellant's home.

Shortly after Detective Cordero exited the interview room, Detective Robert Turner entered the room at 3:20 a.m. to collect "basic booking information." He then questioned appellant about the shooting. Initially, appellant denied his involvement.

Detective Turner testified that he left the room at approximately 5:05 a.m. and, shortly thereafter, provided appellant with a soda. At approximately 5:18 a.m., Detective Turner re-entered the interview room and spoke with appellant until 6:15 a.m. He informed appellant that multiple people had placed appellant at the scene, whereupon appellant admitted that he was present and that he had a discussion about the robbery with his co-defendants. He continued to deny that he was the shooter.

Detective Turner entered the room once more at 6:48 a.m. and appellant requested to use the restroom. Detective Turner granted the request and he and appellant stepped out of the interview room until approximately 6:55 a.m. It was not until 8:05 a.m. that appellant admitted to Detective Turner that he shot Powell by accident. Appellant further explained that he had been drinking that night, which had impaired his thinking. After obtaining these statements, Detective Turner exited the interview room. At 8:13 a.m., Detective Turner permitted appellant to make a telephone call. He called his girlfriend at that time.

At 8:35 a.m. Detective Turner re-entered the interview room, followed by Sergeant Troy Harding at 8:40 a.m. The two officers went over appellant's confession and exited the room at 8:50 a.m.

Between 9:00 a.m. and 9:05 a.m., Sergeant Harding re-entered the interview room and had a discussion with appellant about the location of the gun used in the shooting. Sergeant Harding left the room again at 9:25 a.m.

At 1:00 p.m., after the search warrant was executed on appellant's home, appellant's mother was transported to the police station and was escorted into the interview room, where she and appellant spoke for approximately fifteen minutes. According to Detective Turner, appellant was "taken to the jail" at approximately 1:30 p.m., but he did not know when appellant was processed, although he knew that there were commissioners at the jail. Detective Turner testified that he did not immediately take appellant to a commissioner because he "wanted the opportunity to speak to him and explain the charges, get his side of the story" and the officers were "preparing a search warrant" during that time. He explained that the search warrant process took approximately two hours. Although Detective Turner wanted to go to the on-call judge's home to get the warrant signed, the commissioner informed him that the judge's instructions were to wait until he arrived at his office at 8:30 a.m. At that time, the search warrant was signed.

Sergeant Harding expressed similar sentiments, explaining that they were attempting to gather evidence in support of a search warrant and to prevent appellant from making a call and causing evidence to be disposed of.

The trial court made the following findings: [3]

With regard to the question of the motion to suppress statements made by [appellant] during the course of approximately eleven and a half hours of being in the custody of the police, the Court will begin, as a backdrop, by rejecting a delay Type 2 analysis or weighing of the interrogation. That is the type that is deemed to be a necessary delay and immaterial to suppression. So it's rejected as a pure mat-

---

3. The trial court employed the "types" and "classes" of delays set forth by this Court in *Odum v. State*, 156 Md.App. 184, 202–04, 846 A.2d 445 (2004). These categories shall be explained in greater detail, *infra*.

ter. . . . [A]nd that's because throughout the interrogation there is no information that was gathered that would have served as a basis for obtaining an arrest warrant that was not already in hand. The same is true with regard to information to support application for a search warrant.

Shooters often hide weapons at home and a warrant would have been issued under the circumstances, plus the warrant effort began at a time when [appellant] was still protesting that he was innocent. . . .

With regard to the interrogation, I believe that we have to begin with the arrival at the station. And that period of time up until 2:23.58, the Court considers to be a Type 5 delay . . . a delay that is for the sole purpose of custodial interrogation, but during which no interrogation actually occurs. Detective Morissette gathered biographical information with the exception of the Advice of Rights and Waiver, but there was no questioning during that period of time.

. . . .

That period of time between 2:43 and 2:59 . . . a little over 16 minutes when Detective Cordero was in the interview room, the Court characterizes that as a Type 4, Class II, unnecessary and deliberate delay that violates the prompt presentment requirement and is for the sole purpose of obtaining a confession, and the Court considers that as weighing heavily against a determination of voluntariness.

During the period of time from 3 to 3:19.28, [appellant] is alone. That would be a Type 5 delay, one that is for the sole purpose of custodial interrogation, but during which no interrogation occurs. Obviously, that would be of slight weight with regard to the issue of voluntariness.

That period of time from 3:19.28 to 3:37.15, [sic] also a Type 5 delay. More information although redundant in the nature of that obtained by Detective Morissette and Cordero, plus more, [sic] no questioning regarding the crime occurring. And at this period of time—during that period of time Detective Turner is in the room.

The period of time from 3:37.15 to 5:05.15, an hour and 28 minutes, this is a Type 4 interrogation, weighs heavily against voluntariness . . . That period of time from 5:05 until 5:13.5, the Defendant is alone. This is Type 5. No interrogation is occurring.

From 5:13 to 6:13.26, an hour, interrogation is occurring. This is Type 4, and we give it the appropriate weight. From 6:13.26 to 6:47.06, the Defendant is alone. That is Type 5. Between 6:47.06 and 6:50.27, there is no interrogation occurring. That is also Type 5.

From 6:50.27 to 6:51.57, [appellant] is alone. That's Type 5. No interrogation. From 6:51.57 to 6:55.53, this is Type 5. [Appellant] was taken to the bathroom and offered breakfast. . . . From 6:55.53 to 8:05.37, a period of one hour and ten minutes, there is Type 4 interrogation occurring. We give it the appropriate weight.

From 8:05.37 until 8:10.35, [appellant] is alone. From 8:10.35 to 8:39, that's also Type 5 as to the period of time before when [appellant] is alone. . . . There is no interrogation during this period of time.

Between 8:30.14 and 8:46 when Detective Harding is there, that's a period of seven minutes. This is Type 4 interrogation. We give it the appropriate weight. Between 8:46 and 8:48.17, that's a three-minute period. It's a mixture of Type 4 and Type 2. The Court deems it to be more of Type 2 insofar as the questioning is an effort to recover the gun and to keep it from falling into the wrong hands.

From 8:48.17 to 9:15, [appellant] is alone. That is a Type 4 [sic] delay. Between 9:15.50 and 9:31, this is more questioning about the gun, a mixture of Type 4, but more of a Type 2 because there is an effort to find out where the gun is at. That period was 16 minutes.

Between 9:28.30 and 12.30.47, the Court deems that to be Type 1 . . . is one that can have no effect on the voluntariness of a statement and is, therefore, immaterial to the suppression. The statement had been given by then and

there was no effort to obtain a statement during that period of time.

In addition to weighing the delay, the circuit court considered that appellant was sixteen years old, in the ninth grade, able to speak the English language and displayed rational thought processes. Although not experienced with the adult criminal justice system, appellant had prior contact with the system as a juvenile "sufficient to have been read his *Miranda* Rights." The court found that he was not under the influence of alcohol or drugs and that the detectives "carefully avoided making any promise" to appellant during their interactions. The court further pointed out that appellant "challenged the officers as to the nature of any incriminating evidence against him and offered numerous denials...." In addition, the court determined that appellant demonstrated that he was alert and "out and about" after 1:00 a.m. when he was arrested and, although he communicated that he was tired at approximately 6:47 a.m., he "remained sharp of wit or [sic] alertness, including discerning efforts of Detective Turner to perhaps put words in his mouth."

The court acknowledged that appellant made several requests to place a telephone call to his mother and that, initially, the requests were denied, concluding that it "was reasonable for police to delay any contact until the search warrant was executed ..." because appellant indicated during the interviews that his mother was at home. When given the opportunity to call his mother, the court observed, appellant called his girlfriend.[4] Finally, the court observed that appellant was permitted bathroom breaks, food and drink whenever they were requested although perhaps "not as many opportunities ... as one might have preferred."

Ultimately, the court concluded:

The Court notes that the total time of actual interrogation was 4 hours and 21 minutes. We go through what I went

---

[4]. The transcript of the police interview reveals that appellant did not have a home telephone and was in possession of his mother's cellular phone, so she could not be reached by telephone.

through. Twenty-seven of those minutes related to Detective's [sic] Harding's—Sergeant Harding's questioning about the whereabouts of the gun.

Weighing the various factors, acknowledging that the Court has effectively found that the Defendant was being held by the police specifically to get a statement, looking at the totality of the circumstances, the Court finds that the statements made were voluntarily made and the motion to suppress the statement is denied.

The Court of Appeals has explained:

The trial court's determination regarding whether a confession was made voluntarily is a mixed question of law and fact. *See Baynor v. State*, 355 Md. 726, 729 n. 1, 736 A.2d 325, 326 n. 1 (1999); *Hof* [*v. State* ], 337 Md. [581] at 605, 655 A.2d [370] at 382 [ (1995) ]; *Hillard* [*v. State* ], 286 Md. [145] at 151, 406 A.2d [415] at 419 [ (1979) ]. As such, we undertake a *de novo* review of the trial judge's ultimate determination on the issue of voluntariness. Our review of the Circuit Court's denial of Appellant's motion to suppress is limited to the record of the suppression hearing. *See Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519, 524 (2000).

*Winder v. State*, 362 Md. 275, 310–11, 765 A.2d 97 (2001).

Appellant contends that "the facts surrounding the interrogation, including the fact that the officers deliberately and unnecessarily delayed taking [appellant] to a District Court Commissioner until they obtained a confession, rendered [appellant's] statement involuntary, and the trial court erred when it ruled otherwise." Essentially, appellant argues that, although the trial court acknowledged that, as a whole, the delay from arrest to presentment was not necessary to obtain additional information for purposes of charging appellant or to obtain a search warrant, the entire delay was sufficient to render his confession involuntary when considered with the fact that the interrogation was conducted in an interview room in the homicide division, which appellant points out is a "naturally coercive environment." Appellant adds that he was merely sixteen years old and he cried at one point during the

interrogation, evidencing his vulnerability. Appellant further contends that the testimony demonstrated that his "intelligence was below average" because he did not know his zip code, what his mother did for a living or his grandmother's first name. In addition, appellant points out that he told a detective that his mother had pulled him out of school because his grade point average was "zero to zero."

The State counters that the trial court erred in concluding that the overall delay was unnecessary. The State argues that "this type of delay, for the purposes of further investigating the crime and the extent of a suspect's involvement in that crime, does not violate the right of prompt presentment and does 'not weigh in any degree against voluntariness.' " (quoting *Freeman v. State*, 158 Md.App. 402, 453, 857 A.2d 557 (2004)). In addition, the State makes two alternative arguments: (1) even if the delay was unnecessary and deliberate for the purpose of interrogation, under the totality of the circumstances, the statement was voluntarily made, or (2) if the court erred, any error was harmless because appellant did not object to the testimony of Detective Turner and Sergeant Harding when they related the substance of appellant's statements.

■ We begin our analysis with a review of Maryland Rule 4–212(e), which provides, in pertinent part: "The defendant shall be taken before a judicial officer of the District Court without unnecessary delay and in no event later than 24 hours after arrest. . . ." The purpose of this rule is to reduce " 'the risk that a confession will be coerced during a custodial interrogation conducted before the accused is advised of his rights by a district court commissioner.' " *Freeman v. State*, 158 Md.App. 402, 444, 857 A.2d 557 (2004) (quoting *Faulkner v. State*, 156 Md.App. 615, 651, 847 A.2d 1216 (2004)).

■ An unnecessary delay, however, is not dispositive of the issue of voluntariness. Md.Code (2006 Rep. Vol., 2007 Supp.), Courts and Judicial Proceedings Article § 10–912 provides:

### § 10–912. Failure to take defendant before judicial officer after arrest

(a) Confession not rendered inadmissible.—A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest within any time period specified by Title 4 of the Maryland Rules.

(b) Effect of failure to comply strictly with Title 4 of the Maryland Rules.—Failure to strictly comply with the provisions of Title 4 of the Maryland Rules pertaining to taking a defendant before a judicial officer after arrest **is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession.**

(Emphasis added).

As noted *supra*, the trial court employed the categories of delay that this Court previously delineated in *Odum*, 156 Md.App. at 202–04, 846 A.2d 445, upon a review of the trilogy of prompt presentment cases decided by the Court of Appeals in 2003: *Williams v. State*, 375 Md. 404, 825 A.2d 1078 (2003); *Facon v. State*, 375 Md. 435, 825 A.2d 1096 (2003); and *Hiligh v. State*, 375 Md. 456, 825 A.2d 1108 (2003). In *Odum*, we opined:

We conclude that the *Williams* trilogy of cases is based upon the following general concepts. First, because the concern is with delay in presentment that affects the voluntariness of a statement given during custodial interrogation, a delay that can have no effect on the voluntariness of a statement is immaterial to suppression. That concept is illustrated in the subject case, as we explain, *infra*.

Second, some delays are necessary. These present no violation of Rule 4–212(e) or (f) and do not weigh in any degree against voluntariness in the suppression court's evaluation process. In *Williams*, the Court "gave examples of situations in which a delay would be regarded as necessary[,]" by quoting from *Johnson v. State, supra* [282 Md. 314, 384 A.2d 709 (1978) ], and saying:

" '(1) To carry out reasonable routine administrative procedures such as recording, fingerprinting and photographing; (2) to determine whether a charging document should be issued accusing the arrestee of a crime; (3) to verify the commission of the crimes specified in the charging document; (4) to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value; (5) to obtain relevant non-testimonial information likely to be significant in discovering the identity or location of other persons who may be associated with the arrestee in the commission of the offense for which he was apprehended, or in preventing the loss, alteration or destruction of evidence relating to such crime.' "

*Williams*, 375 Md. at 420, 825 A.2d at 1087 (quoting *Johnson*, 282 Md. at 329, 384 A.2d at 717).

Third, there may be delays which are unnecessary, and thereby violative of Rule 4–212(e) and (f), but which are not for the sole purpose of custodial interrogation. These delays must be weighed against voluntariness, but they do not require "very heavy" weight against voluntariness in that evaluation. Our analysis in the instant matter calls these delays "Class I."

Fourth, there are unnecessary delays, violative of Rule 4–212(e) and (f), which are deliberately for the sole purpose of custodial interrogation. Our analysis refers to this type of unnecessary delay as "Class II." A suppression court is required to weigh a Class II delay "very heavily" against voluntariness in its evaluation of a resulting statement's admissibility.

Fifth, although subjecting the arrestee to actual interrogation is the best evidence that that part of a delay in presentment is for the sole purpose of custodial interrogation, a delay, depending on the facts, may be for the sole purpose of custodial interrogation, although unaccompanied by actual interrogation. *See Hiligh v. State*, 375 Md. at 473–74, 825 A.2d at 1118 (including within a delay described as one "for the sole purpose of extracting incriminating statements" the period on March 21, 1995, between 3:30

a.m., when charging document was prepared, and 8:35 a.m., when custodial interrogation commenced concerning crime that was the subject of the charging document).

*Id.* at 202–03, 846 A.2d 445.

The *Williams* trilogy of cases clarified the interplay between Maryland Rule 4–212(e) & (f) and C.J.P. § 10–912 and their effect on the voluntariness analysis. The *Williams* case involved a delay of forty-seven hours between arrest and presentment, a clear violation of the twenty-four-hour requirement embodied in Maryland Rule 4–212. 375 Md. at 414, 825 A.2d 1078. Williams was arrested, without a warrant, on July 30, 2000 at 4:10 a.m., for his suspected involvement in two robberies. *Id.* at 410, 825 A.2d 1078. During the course of the interrogations, police also acquired information that Williams was involved in two homicides. Immediately after his arrest, there was a necessary delay until 9:25 a.m. for medical treatment. *Id.* at 423, 825 A.2d 1078. At 9:25 a.m., Williams was placed in an interview room and, within ten minutes of questioning, appellant orally confessed to the two robberies. *Id.* Williams thereafter produced two written confessions by 12:42 p.m. "At that point, after just over three hours of interrogation, the police had all of the basic information they needed to present petitioner to a Commissioner. They knew who he was and had solid grounds upon which to charge him with two armed robberies. They could have taken him to a Commissioner and then returned him to the station for questioning as to the two homicides." *Id.*

After acquiring the confessions to the robberies, the police turned Williams over to the homicide unit for interrogation on the separate homicides. *Id.* at 424, 825 A.2d 1078. Thereafter, he was interrogated by multiple detectives, during which timeframe, he provided two more statements concerning the two murders, was left overnight in an interview room to sleep on the floor, was taken in a van to search for his accomplice the next day, identified a photograph of his accomplice and gave an additional statement before he was presented to a Commissioner at 8:30 p.m. on July 31. *Id.* at 413–14, 825 A.2d 1078. The Court observed, "There was no concern about

possible harm to other people or property, and it [did] not appear that the police were focusing on the identity or location of other persons." *Id.* The Court concluded that the "sole, unadulterated purpose of the subsequent interrogation was to obtain incriminating statements...." *Id.* at 424, 825 A.2d 1078. Thus, "the entire delay from and after 1:13 p.m. on July 30 was unnecessary and thus constituted an independent violation of Rule 4–212. Both violations, moreover, were deliberate." *Id.* The Court held that the deliberate delay for the purpose of custodial interrogation was entitled to "very heavy weight" in the voluntariness analysis and remanded the case for a new trial.

In *Facon,* the defendant was arrested in the District of Columbia and transported to Prince George's County the next day. Although the total delay was approximately thirty-six hours from the time of his arrest to his presentment before a Commissioner, only twelve and one-half hours occurred in Maryland, which was the only delay that triggered Maryland Rule 4–212(e). 375 Md. at 453, 825 A.2d 1096. The trial court determined that the only time to be given weight in the voluntariness analysis was the time during which appellant was actually interrogated and thus failed to weigh the entirety of the twelve-and-one-half hour delay. *Id.* at 454, 825 A.2d 1096. The Court remanded the case for a new trial because the court failed to accord any weight to the remainder of the time during which Facon was in custody.

In *Hiligh,* a post conviction case, the Court of Appeals held that Hiligh had been denied his Sixth Amendment right to effective assistance of counsel because, although his counsel moved to suppress his statements, he failed to argue that the delay in prompt presentment rendered them involuntary. 375 Md. at 473–74, 825 A.2d 1108. Hiligh was arrested, without a warrant, and taken to the police station at 10:58 p.m. on March 20, 1995. *Id.* at 461, 825 A.2d 1108. A detective questioned Hiligh based upon information that he had already gathered about the case, confirming his identity as one of the suspects when the pager number the detective had been given for one of the suspects rang while on Hiligh's person when he

dialed it. In addition, a search revealed that Hiligh was in possession of a blue and white bandanna, consistent with a report from a witness. Within an hour, Hiligh was photographed and an eyewitness identified the person in the photograph as one of the robbers. *Id.* Hiligh was then handcuffed in the interrogation room and they "proceeded to prepare the appropriate charging documents." *Id.* The charging documents had been prepared by 3:30 a.m. and, although a commissioner was on duty in the same building, Hiligh was left alone in the room until 7:15 a.m. the next morning. Thereafter, he was taken to the hospital for treatment of a wound, returned to the station, *Mirandized,* and over the course of the day gave multiple statements in response to interrogation. *Id.* at 462, 825 A.2d 1108. "At 10:23 p.m., 23 hours and 32 minutes after he was first brought to the station, [Hiligh] was taken before a District Court Commissioner." *Id.* The Court held that Maryland Rule 4–212(e) was violated. "The record demonstrates that the police had all of the information and had completed all of the administrative paperwork necessary to present petitioner ... by 3:30 a.m. on March 21, at the latest...." *Id.* at 473, 825 A.2d 1108. The delay was unnecessary, deliberate and for the sole purpose of "extracting incriminating statements." *Id.* Had counsel argued that, under the totality of the circumstances, the confession was involuntary, in light of the fact that the delay beyond 3:30 a.m. was entitled to heavy weight, the court would have been required to give the delay heavy weight in its analysis. *Id.* at 474, 825 A.2d 1108.

In *Odum,* a case involving a delay of thirty-one and one-half hours, we remanded the case for the requisite factual findings to evaluate the voluntariness of the defendant's confessions, guided by the *Williams* trilogy. Odum, a robbery suspect, was arrested at 11:00 a.m. on June 26, 2001. 156 Md.App. at 195, 846 A.2d 445. At 11:37 a.m., he was placed in an interview room and held, pursuant to the investigating officer's instructions, until the officer arrived at the station at 5:40 p.m. From 5:40 p.m. until 6:30 p.m., the officer informed Odum of the charges against him and photographed him, after which he left the room. *Id.* Another officer entered at 6:52 p.m. and

obtained a *Miranda* waiver. Between 8:21 p.m. and 9:10 p.m., the officer asked appellant where he was on the night of the robbery and Odum stated that he was in Virginia. No other questions were asked at that time. Odum was then left alone in the room from 9:10 p.m. until 1:00 a.m. on June 27, when another detective entered the room and engaged in a discussion about his murder investigation. At 2:00 a.m., appellant waived his *Miranda* rights once more and gave a written statement until 4:00 a.m. At 1:56 p.m., Odum was taken to a holding cell and, at 6:12 p.m., he was presented to the Commissioner. *Id.* at 193–97, 846 A.2d 445. Because the trial court failed to make the appropriate factual findings to determine the appropriate types and classes of delays, delineated *supra,* we remanded the case.

In *Perez v. State,* 168 Md.App. 248, 896 A.2d 380 (2006) *(Perez II),* following remand in *Perez v. State,* 155 Md.App. 1, 841 A.2d 372 (2004) *(Perez I)* for a new suppression hearing for further factual findings and determinations in light of the trilogy of cases, we applied the *Odum* types and classes of delays. In *Perez II,* the delay was approximately forty-eight hours. We observed:

> The appellant acknowledged some involvement in a robbery of the animal hospital at 9:28 a.m. on August 9, at hour nine of custodial detention. His first written statement started at 12:07 p.m. and was completed at 2:00 p.m. that day, at hour 14 of custodial detention. About an hour later, at 3:01 p.m., the appellant told Detective Hoffman that Gordon had fired a gun when they were in the animal hospital. His second statement, also in writing, was started at 3:31 p.m. and was completed at 5:01 p.m. the same day, at hour 17 of custodial detention.

> The motion court found that the delay in presentment from the appellant's arrival at CID at 12:42 a.m. on August 9 to 8:10 p.m. on August 9 was a Class I delay, because it was not for the sole purpose of obtaining a confession.

*Id.* at 277–78, 896 A.2d 380.

Perez argued that the "factual findings underlying that conclusion are clearly erroneous" and unsupported by the

record. *Id.* at 278, 896 A.2d 380. We disagreed, finding the testimony of three detectives to be ample support for the court's findings as they related that they were also investigating what objects were stolen during the robbery, the location of the murder weapon, the development of witnesses and the defendant's relationship to a co-defendant. We explained that the police had another purpose for the delay that was not to obtain an inculpatory statement because they had received information implicating another man in the crime, who was connected to the crime through appellant. Thus, the focus of their investigation from 2:23 a.m. was Perez's relationship with this man. *Id.* at 279, 896 A.2d 380. We also rejected Perez's arguments that the trial court failed to specify the factors it relied upon in making the voluntariness determinations because the trial court clearly considered his age, education level, communication skills, that he was not under the influence of alcohol or drugs and that he had been given time to sleep and food, water and bathroom breaks. *Id.* at 280–81, 896 A.2d 380.

■ Having conducted our own constitutional appraisal, we discern no error in the trial court's determination that appellant's statements were voluntary. Appellant was arrested pursuant to an outstanding warrant shortly after 1:00 a.m. on March 21, 2007, having already been charged with first-degree murder and related charges arising out of the shooting on Daimler Drive. Appellant was placed in the interview room at approximately 2:00 a.m. Although he was not taken before a Commissioner until approximately twelve and one-half hours following his arrest, he provided the inculpatory statements at 8:05 a.m., according to Detective Turner's testimony. Any subsequent delay is not relevant to our voluntariness analysis.

■ We reject the State's contention that the seven and one-half hour delay from 2:00 a.m. until the time that the search warrant was signed at approximately 8:30 a.m. was necessary to acquire a search warrant for appellant's home. The trial court correctly observed that the police had sufficient information for the search warrant prior to appellant's interview and, in fact, gained no additional substantive information

during their interviews with appellant to assist in their efforts to acquire the search warrant.

We have acknowledged that some delays are necessary and " 'do not weigh in any degree against voluntariness....' " *Freeman,* 158 Md.App. at 453, 857 A.2d 557 (quoting *Odum,* 156 Md.App. at 202, 846 A.2d 445). "Reasonable routine administrative procedures" including fingerprinting and photographing are considered among those valid reasons for delay. *Id.* (citing *Williams,* 375 Md. at 420, 825 A.2d 1078). We have also explained that a delay may be necessary for the purpose of collecting information to determine whether to charge a suspect, to gain information for the purpose of avoiding harm to persons or property and to collect information that may assist in locating others in connection with the crime. *Id. See also Faulkner v. State,* 156 Md.App. 615, 654, 847 A.2d 1216 (2004).

■ The only routine administrative-type justification offered by the detectives during the suppression hearing was the need to complete an arrest report and to take background information. From shortly after 2:00 a.m. until approximately 2:41 a.m., roughly twenty minutes, Detective Morissette collected such information and thereafter, Detective Cordero joined those efforts and collected another roughly sixteen minutes-worth of background information. Detective Cordero went a step further, verifying and confirming information that had been collected by the investigation team in showing appellant pictures of his co-defendants and asking him to identify his co-defendants. During that time, Detective Cordero also told appellant why he was arrested, presented him with the arrest warrant and informed him that he was being charged as an adult with first-degree murder for the incident that occurred on Daimler Drive. At that point, the detectives possessed sufficient information to confirm that appellant was the person for whom there was an outstanding arrest warrant for the shooting on Daimler Drive. Based upon these facts, a period of approximately one hour, at most, could be considered a necessary delay for administrative purposes.

From approximately 3:00 a.m. until 8:05 a.m., appellant was deliberately detained for the purpose of obtaining a confession. During that period of time, Detective Turner engaged in questioning about the murder and informed appellant that his co-defendants had implicated him as the shooter. This resulted in approximately five hours of an unnecessary delay for the sole purpose of obtaining a confession. But, as the trial court also properly observed, Detective Turner stepped out of the room shortly after 5:00 a.m., for roughly ten minutes, to bring appellant something to drink before commencing another hour of questioning. Appellant was then left alone from approximately 6:15 a.m. until 6:48 a.m., when he was permitted to leave the room to use the bathroom. Interrogation again resumed at approximately 7:00 a.m. Appellant confessed just over one hour later. Thus, although appellant was held for the purpose of interrogation for a total of five hours before he confessed, actual interrogation, which is entitled to the heaviest weight in our analysis, occurred for approximately four out of the five hours prior to appellant's confession.

According heavy weight to the five hours of unnecessary delay in this case, we nonetheless hold that appellant's confession was voluntary under the totality of the circumstances. Our review of the suppression hearing testimony and the transcript of the interviews confirms that, although sixteen years old, appellant had previously been charged with a juvenile offense and had been read his *Miranda* rights. Appellant was advised of those rights, indicated that he understood them and does not challenge the voluntariness of his *Miranda* waiver.

While appellant was an underachiever in school, we find no support for appellant's claim that it was as a result of lower than average intelligence. Appellant indicated during the interview that his mother removed him from school because the school was preparing to dismiss him due to his poor attendance record.[5] Moreover, he evidenced an understand-

---

5. Appellant stated that he was absent from school for approximately one quarter due to his detention for the juvenile offense.

ing of the English language and demonstrated rational thought processes throughout the interrogation. In fact, appellant demonstrated an acute understanding of the situation and repeatedly chastised Detective Turner for misunderstanding him and repeatedly clarified the admissions that he made throughout the interview. Although appellant did express that he was tired shortly after 6:00 a.m., he continued to remain steadfast in his denial throughout the interrogation, challenging Detective Turner's claims that the police had evidence against him and pointing out when Detective Turner had contradicted himself in his representations to appellant.

Detective Turner offered appellant coffee and breakfast, but appellant declined. Later, he accepted the offer for a Pepsi. Appellant was offered one bathroom break at the beginning of the interview, which he declined. He was offered another bathroom break just before 7:00 a.m., which he accepted. Appellant made no food, drink or bathroom requests that were denied throughout the entire time he was held in the interview room.

The only requests that appellant made were that he be allowed to call his mother. In his brief submitted to this Court, the sum total of his argument that the denial of that was a salient factor in a determination of the voluntariness of his statement is as follows: "Mr. Moore asked to speak to his mother one time when Detective Cordero questioned him, eleven times when Detective Turner questioned him and one time when Sergeant Harding questioned him." Although this Court and the Court of Appeals have recognized the importance of the parental role when a juvenile is faced with the decision whether to waive his or her *Miranda* rights, the fact that a juvenile's waiver is without the guidance and advice from a parent does not, *ipso facto,* render the juvenile's pretrial statement involuntary. The Court of Appeals, in *McIntyre v. State,* 309 Md. 607, 526 A.2d 30 (1987), eschewed a *per se* rule in providing parental counsel to a juvenile in police custody:

Notwithstanding McIntyre's urging, we are not persuaded to depart from the totality of the circumstances test in determining the validity of a *Miranda* waiver and in assessing the traditional voluntariness of a juvenile's statement to the police. In so concluding, we recognize that some states have developed the so-called interested adult rule pursuant to which an adult interested in the juvenile's welfare, generally a parent, must be informed of the child's rights, have an opportunity to consult privately with the child, and be present during any interrogation. *E.g., Lewis v. State,* 259 Ind. 431, 288 N.E.2d 138, 142 (1972); *State in Interest of Dino,* 359 So.2d 586, 594 (La.1978); *Com. v. A Juvenile (No. 1),* 389 Mass. 128, 449 N.E.2d 654, 657 (1983) (applies absolutely for children under fourteen; for those fourteen or over State has very heavy burden if no consultation permitted); *In re E.T.C.,* 141 Vt. 375, 449 A.2d 937, 940 (1982).

*Id.* at 621–22, 526 A.2d 30.

The *McIntyre* Court thus provided the following explication of the consideration of access to parental advice in determining the voluntariness of a juvenile's pretrial statement:

These cases recognize the importance of parental involvement in a juvenile's decision to waive *Miranda* rights, and they consider this factor in evaluating the validity of the juvenile's waiver. Certainly the lack of access to parents prior to interrogation does not automatically make a juvenile's statement inadmissible. *Bean* [*v. State,* 234 Md. 432, 440, 199 A.2d 773 (1964) ]; *Green* [*v. State,* 236 Md. 334, 342, 203 A.2d 870 (1964) ].

*Id.* at 620, 526 A.2d 30.

The question before the Court of Appeals in *Jones v. State,* 311 Md. 398, 535 A.2d 471 (1988), was whether the parental notification provisions of Md.Code (1984 Repl.Vol., 1987 Cum. Supp.), § 3–814(b) of the Courts and Judicial Proceedings Article apply to a seventeen-year-old juvenile arrested and charged with first-degree murder. A conclusion that said provisions applied would require the Court to determine

whether noncompliance with these provisions rendered the juvenile's confession involuntary. *Id.* at 400, 535 A.2d 471. The case involved the fatal shooting of a Baltimore City school teacher by two young males who had grabbed her purse as she was exiting her automobile. *Id.* at 402, 535 A.2d 471. Immediately after appellant's fifteen-year-old cousin implicated him and his accomplice before the grand jury, the police transported appellant to the police station at 4:25 p.m., placed him in an interview room and administered *Miranda* warnings. Josephine Jones, the grandmother and guardian of both appellant and his cousin, both of whom lived with her, was in an outer office of the police station at that time. *Id.*

Whether the grandmother was present at the station in connection with the interrogation of appellant's cousin or with appellant's arrest and interrogation was unclear from the evidence. There was also conflicting evidence as to whether the police intentionally prevented the grandmother/guardian from seeing appellant and as to when she was advised that appellant had been arrested. *Id.* Appellant initially denied complicity in the crimes when first interrogated by the police, but acknowledged accompanying his accomplice when the accomplice robbed and shot the victim. Appellant also acknowledged receiving money from his accomplice that had been taken from the victim's purse, after which his statement was reduced to writing. *Id.*

Chief Judge Robert C. Murphy, writing for the Court of Appeals, concluded that appellant's interpretation of C.J. § 3–814(b) did not comport with the purposes of the Juvenile Causes Act, *i.e.* that, "Although the special protections thereby afforded to children are not in express terms limited to children within the jurisdiction of the juvenile court, it is clear that the legislature did not intend to extend these protections to all children." The purposes of C.J. § 3–814(b) are, the Court penned, " '(1) to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle. . . .' " *Id.* at 406, 535 A.2d 471 (quoting C.J. § 3–814(b)). The Court concluded:

Manifestly, therefore, some children were excluded from the protective ambit of the Act. Who these children would be, if not those expressly removed from juvenile court jurisdiction by § 3–804, is opaque at best. We think a more natural interpretation of § 3–802(a)(1) would find in it a recognition by the legislature that some children are not in a position to benefit from the Act's special treatment, *and that among these children are those, as here, expressly removed from juvenile court jurisdiction.* Thus, to extend the parental notification requirements of § 3–814(b) to an individual charged with offenses beyond the juvenile court's jurisdiction would be inconsistent with the stated purposes of the Juvenile Causes Act.

*Id.* at 406–07, 535 A.2d 471 (emphasis added).

The *Jones* Court held, as had the *McIntyre* Court:

We recognize, of course, that great care must be taken to assure that statements made to the police by juveniles are voluntary before being permitted in evidence. *McIntyre v. State,* 309 Md. 607, 617, 526 A.2d 30 (1987). Our cases have held that the age of a juvenile, in itself, will not render a confession involuntary; rather, we have applied the totality of the circumstances test in determining the validity of a juvenile's waiver of constitutional rights and the traditional voluntariness of a juvenile's confession. *Id.* at 620, 526 A.2d 30. The absence of a parent or guardian at the juvenile's interrogation is an important factor in determining voluntariness, *although the lack of access to parents prior to interrogation does not automatically make a juvenile's statement inadmissible.*

*Id.* at 407–08, 535 A.2d 471 (emphasis added).

■ Because of the gravity of the offense, appellant was charged as an adult. Although the *Jones* opinion was decided in the context of the applicability of the parental notification provisions of C.J. § 3–814(b), we find persuasive the rationale that, under the Act, juveniles expressly removed from juvenile court jurisdiction should not be entitled to the special protections afforded to other children in evaluating the voluntariness

of the juvenile's custodial statement. In the final analysis, Maryland law currently recognizes that lack of parental involvement is but one factor to be considered in a totality of the circumstances analysis. *See also Holmes v. State,* 116 Md. App. 546, 554, 698 A.2d 1139 (1997) (reaffirming that the absence of a parent or guardian does not, in itself, render a juvenile statement involuntary and holding that, although Holmes made much of the fact that his mother was not permitted to sit with him during interrogation, he did not ask to speak with his mother, nor did he produce evidence showing that his mother would have assisted in contemplating his legal rights).

In sum, we agree with the trial court that the delay in permitting appellant to call his mother was permissible under the circumstances, as the efforts to obtain and execute a search warrant for her home were ongoing. Despite the unnecessary and deliberate delay in this case, we are persuaded that the delay did not render the confession involuntary. Under the totality of the circumstances, appellant knowingly and voluntarily confessed.

## II

Appellant next contends that, during closing argument, the State improperly referred to facts not in evidence and improperly appealed to the passions of the jury by engaging in name-calling. Appellant takes exception, for the first time in this appeal, to the following rebuttal argument made by the State during closing:

I know it may be hard for you to believe that someone can be so cold and uncaring, but that's just what you have here. And if you look at the tape, he didn't care then just like he did in this courtroom. He slops down in his seat sitting on his arm. He couldn't care less. Totally uninterested. Totally unfazed by this. And, apparently, he also feels that he shouldn't be punished for what he did; that he should be allowed to go home and continue living his life despite the fact that Maurice won't be able to live his life,

and that Thomas and Tyrelle will probably be forever affected by this.

But when he got with his mother, he changed. He became a baby then. I want to see my mommy. Yeah, he was crying. Yeah, he was upset. But let me tell you, that's not the person that you have before you. He's a coldhearted thug. He may have been a baby with his mother, but let me tell you, you better believe that that night out there when he had that gun in his hands, he wasn't a baby. He was a man then. *He was a thug. He was a gangster. He lives the hard life. Live by the code. Don't tell. Never snitch.* That's what you have before you.

(Emphasis added).

According to appellant, there was no evidence presented that he was a member of a gang or that he "lived the hard life" or "lived by the code." Although appellant never objected to these statements at trial, and he offers no reason for his failure to object in this appeal, he contends that the prosecutor's remarks "crossed the lines established [by *Lee v. State,* 405 Md. 148, 166, 950 A.2d 125 (2008) and *Walker v. State,* 121 Md.App. 364, 380–81, 709 A.2d 177 (1998) ] and because [appellant] was prejudiced by them, reversal is required."

The State argues that this claim is not preserved for appellate review and that, when taken in context, it does not warrant reversal. The State points out that, throughout appellant's closing argument, appellant's counsel "repeatedly attacked the voluntariness of [appellant's] statements" by painting a picture of appellant as a "tired, sleepy kid who desperately wanted to speak with his mother." Counsel for appellant stated in closing argument, "He's a kid who continues, 'I want to see my mother, where is my mother, I want to call my mother, let me talk to my mommy' " and that he "just turned 16 years old. He's a kid. Look at the way he acted." The State posits that its comments were "in direct response to [appellant's] closing argument." The State further contends that it did not make reference to facts that were not in evidence by arguing that appellant "lived the

hard life" and "lived by the code" because the video of the confession, which was played for the jury, showed appellant denying that he was the shooter and asserting that he would not identify the shooter because he was not trying to be "no snitch." According to the State, those statements support its claim that appellant "lived by the code." The State also contends that the evidence that appellant and his friends approached Powell and his friends to rob them, after spending the evening hanging out and drinking alcohol, because they "looked fresh" further supports that he "lived the hard life."

██ Because this claim is unpreserved, we must find that it rises to the level of depriving appellant of a fair trial in order to justify reversal. *Clermont v. State*, 348 Md. 419, 456, 704 A.2d 880 (1998); *Rubin v. State*, 325 Md. 552, 588, 602 A.2d 677 (1992). In *Lee v. State*, 405 Md. 148, 950 A.2d 125 (2008), the Court of Appeals reviewed a similar claim where the State, over the defendant's objection, argued to the jury during rebuttal closing argument that the victim's testimony was not credible because "he was following 'the law of the streets,' that the jury should protect their community and clean up the streets, and that the jury should teach the defendant not to abide by 'the law of the streets' in settling disputes." *Id.* at 152–53, 950 A.2d 125. The Court held that the "combination of all these comments exceeded the permissible scope of closing argument and that the judge did err in permitting the prosecutor to make those comments." *Id.*

The Court recognized that in criminal cases, the prosecutor is allowed " 'liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom. . . . [The prosecutor] is free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments. . . .' " *Id.* at 163, 950 A.2d 125 (quoting *Degren v. State*, 352 Md. 400, 429, 722 A.2d 887 (1999)). " '[A]ppeals to class, prejudice or to passion are improper and may so poison the minds of jurors that an accused may be deprived of a fair

trial.'" *Wilhelm v. State*, 272 Md. 404, 414, 326 A.2d 707 (1974) (quoting *Wood v. State*, 192 Md. 643, 652, 65 A.2d 316 (1949)). The Court in *Lee* explained that, when evaluating such claims on appellate review, they must be "examined in context." 405 Md. at 163, 950 A.2d 125. While protecting the defendant's right to a fair trial is central to the analysis, the Court explained that "[n]ot every improper remark, however, necessitates reversal, and whether a prosecutor has exceeded the limits of permissible comment depends upon the facts in each case." *Id.* at 164, 950 A.2d 125 (citations omitted).

Initially, we must examine, in context, whether the prosecutor's remarks were improper. Essential to this analysis is whether the remarks were supported by the evidence presented during trial. *Id.* at 166, 950 A.2d 125 ("Generally, we have deemed comments made during closing argument that invite the jury to draw inferences from information that was not admitted at trial, improper.") (citations omitted). In *Lee,* the Court held that there "was nothing in the record, nor was there any testimony or evidence, however, as to what constituted 'the law of the streets' in this context." *Id.* at 168, 950 A.2d 125. As the State points out, in this case, appellant himself stated during his police interview that he wasn't going to be "no snitch," a phrase of such notoriety "as to be a matter of common knowledge." *Id.* The concept of not snitching is commonly understood as being part of the law of the streets or "living by the code." Detective Turner repeatedly referenced appellant's decision to "live by the code" and his refusal to "snitch on" his co-defendants during the taped interview. Moreover, it can be directly inferred from appellant's own statements regarding his initial refusal to implicate his friends.

With regard to the name-calling, *i.e.*, the prosecutor's statement that appellant was a "thug" and a "gangster," appellant urges us to follow *Walker v. State, supra.* In *Walker*, the prosecutor in a child sexual abuse case called the defendant "an animal" and "a pervert" during closing argument. 121 Md.App. at 374–75, 709 A.2d 177. At trial, Walker

objected to being called an "animal," but failed to object to being called "a pervert." *Id.* at 380, 709 A.2d 177. This Court penned: ". . . except in a very close case, we would not be inclined to find the reference to appellant as 'a pervert,' standing alone, reversible error even though the preferable course would have been to refer to appellant's conduct as 'perverse.' Indeed the nature of the evidence presented certainly gives rise to the conclusion that the actions of appellant . . . were perverse, to say the least." *Id.* But, when viewing the comment, "in conjunction with the characterization of appellant as 'an animal,' we believe the prosecutor, in her zeal, exceeded the bounds of proper comment." *Id.* at 381, 709 A.2d 177. Although this Court found the comments to be improper, when taken together, we never reached the issue of prejudice in *Walker*, as we remanded on other grounds. *Id.* at 382, 709 A.2d 177.

We believe the case *sub judice* is more akin to the prosecutor's comments made in *Wilhelm v. State*, wherein the Court of Appeals addressed the companion case of *Cook v. State.* 272 Md. at 439, 326 A.2d 707. The prosecutor called Cook and his co-defendants "young toughs" during closing arguments. Specifically, the prosecutor argued, " '. . . You saw him on the stand. He couldn't defend himself. *These are the victims— the most common victims of the young toughs because they can't fight back.'* " *Id.* at 410, 326 A.2d 707. The Court opined: "That the assailants could be described as 'young toughs' was abundantly supported by the testimony concerning the manner of the confrontation. . . ." *Id.* at 441, 326 A.2d 707. The Court further explained that "[w]hen the Assistant State's Attorney made reference to 'young toughs' it is patent that in his argument he was referring to the demeanor of the appellant and two of his codefendants called as witness in his behalf and the actions of the assailants at the time of the homicide and robbery." *Id.* at 442, 326 A.2d 707.

Similarly, the evidence presented in this case would support characterizing defendant's actions as those of a "thug" in approaching the group of "fresh" looking young men, armed

with a gun and intending to rob them. Appellant contends, however, that calling him a "gangster" communicates to the jury that he was a "violent gang member," which is not supported by the evidence. We agree that the evidence would not support such an inference. Whether the comment calls upon the jury to draw that inference is less than clear to this Court. To the extent that it does, we would deem the "gangster" comment improper.

Taking all of the comments together, we agree with the State that the line of argument was in direct response to appellant's characterization of himself as young, vulnerable and easily intimidated by police. The State is entitled to respond to argument presented by the defense with *proper* argument. *Lee,* 405 Md. at 162, 950 A.2d 125 ("Generally, 'the party holding the affirmative of the issue . . . has the right to begin and reply . . . . ' ") (quoting *Harris v. State,* 312 Md. 225, 255, 539 A.2d 637 (1988)).[6] With the exception of the "gangster" comment, we do not find the prosecutor's arguments to be improper.

Assuming, *arguendo,* the cumulative effect of the prosecutor's comments exceeded the bounds of permissible closing argument, we would then be tasked with determining whether the comments were sufficiently prejudicial to warrant reversal. The Court in *Lee* set forth the factors to be considered when making this determination. We must consider "the severity of the remarks, the measures taken to cure any potential prejudice, and the weight of the evidence against the accused." *Id.* at 165, 950 A.2d 125 (citations omitted). In *Lee,* the prosecutor repeatedly referred to the "law(s) of the

---

6. The Court explained that the " 'invited response doctrine' calls for the prosecutor's invited response to be considered in context with the defense counsel's own impropriety, it is not applicable when defense counsel has made no improper argument." *Id.* at 169, 950 A.2d 125. We do not perceive defense counsel's closing argument in this case as improper; therefore, the "invited response doctrine" would not apply in this case to permit the prosecutor to "respond to improper conduct in order to equalize the positions of both sides and remedy any unfair prejudice." *Id.* at 168, 846 A.2d 445.

streets" in two different contexts and, after the court issued a curative instruction, it continued with that theme. *Id.* at 175, 950 A.2d 125. The Court also considered that the "evidence against Lee was not overwhelming" as the victim denied that Lee was the shooter. *Id.* at 175, 950 A.2d 125. Finally, although the trial court issued a curative instruction in *Lee,* it was not sufficiently specific and contemporaneous with the improper argument to cure the prejudice caused by the comments. *Id.* at 177–78, 950 A.2d 125.

In the cases cited by appellant, the defendant contemporaneously objected to the prosecutor's improper comments and thus provided the trial court with the opportunity to make a first-level determination regarding the prejudice. Because appellant did not object or move for a mistrial, subsequent to closing argument, the trial court was never afforded the opportunity to rule on his claim.

The remarks, even if considered cumulatively to be improper, were not severe, were limited to a small portion of the prosecutor's closing argument and did not constitute the overarching theme.[7] In addition, the evidence against appellant was overwhelming. The interrogating officers testified to appellant's confession; the videotape of his confession was played for the jury; Charles Dutch, his co-defendant, testified to the precise plan that the group made to rob Powell and his friends and Dutch testified that appellant admitted to shooting Powell. In light of the foregoing, we cannot say that the cumulative effect of the comments was such that it denied appellant a fair trial. Accordingly, we decline to exercise our discretion and find plain error based upon this record. "The unobjected-to, improper argument in the case before us does not rise to the level of the deprivation of a fair trial. This is a less stringent standard than the *Dorsey* [*v. State,* 276 Md. 638, 350 A.2d 665 (1976) ] standard of harmless beyond a reasonable doubt. . . ." *See Clermont,* 348 Md. at 456, 704 A.2d 880 ("In any event, Clermont relies on plain error for relief with

---

7. This may explain why appellant's counsel failed to lodge an objection in the first place.

respect to each of the claimed improprieties in the State's argument. There is no basis for reversal because none of the alleged errors vitally affected Clermont's right to a fair and impartial trial.").

## III

Appellant next assigns error to the imposition of a separate sentence for the attempted robbery of Powell. Appellant was convicted of three counts of attempted robbery with a dangerous weapon and the use of a handgun in the commission of a crime of violence, one count each for Maurice Powell, Thomas Gilbert–Turner and Tyrelle White. Appellant was also convicted of conspiracy to commit robbery, first degree felony murder and involuntary manslaughter for the death of Powell. Appellant was sentenced to life, with all but eighty years suspended, for the felony murder conviction and a concurrent twenty-year sentence for the underlying attempted robbery.

Appellant contends that, because the attempted robbery of Powell was the underlying felony for the felony murder conviction, the sentence for the attempted robbery should merge with the sentence for felony murder, citing *Newton v. State,* 280 Md. 260, 269, 373 A.2d 262 (1977). The State agrees.

In *Newton,* the Court of Appeals addressed this precise issue and explained that when felony murder is supported by the felony of attempted robbery, they are the "... same offense under federal double jeopardy principles." *Id.* at 265, 373 A.2d 262.

The Court opined:

Therefore, to secure a conviction for first degree murder under the felony murder doctrine, the State is required to prove the underlying felony and the death occurring in the perpetration of the felony. The felony is an essential ingredient of the murder conviction. The only additional fact necessary to secure the first degree murder conviction, which is not necessary to secure a conviction for the underlying felony, is proof of the death. The evidence required to

secure a first degree murder conviction is, absent the proof of death, the same evidence required to establish the underlying felony. Therefore, as only one offense requires proof of a fact which the other does not, under the required evidence test the underlying felony and the murder merge.

*Id.* at 269, 373 A.2d 262.

Accordingly, the sentence for the underlying felony of attempted robbery with a dangerous weapon, in addition to the sentence for felony murder, constitute double punishment for the same offense. The sentence for the lesser offense of attempted robbery with a dangerous weapon must be vacated. The remaining sentences for attempted robbery, however, shall stand, as they are not underlying felonies for felony murder convictions, but rather constitute separate crimes.

**IV**

Appellant's final contention is that he was improperly sentenced for first-degree felony murder and that the maximum sentence that the circuit court could have imposed for the death of Powell was for involuntary manslaughter because, in this case, the elements of the two offenses were the same. Appellant avers that the State charged him with the murder of Powell using the language of Md.Code (2002 Rep. Vol., 2007 Supp.), Criminal Law, C.L. § 2–208, which provides:

> (a) Contents.—An indictment for murder or manslaughter is sufficient if it substantially states:
> "(name of defendant) on (date) in (county) feloniously (willfully and with deliberately premeditated malice) killed (and murdered) (name of victim) against the peace, government, and dignity of the State.".
> (b) Manner or means of death.—An indictment for murder or manslaughter, or for being an accessory to murder or manslaughter, need not set forth the manner or means of death.

Accordingly, appellant asserts that he was charged both with first-degree felony murder *and* involuntary manslaughter. In *Dishman v. State,* 352 Md. 279, 721 A.2d 699

(1998), the Court of Appeals held that, although Dishman was charged with murder with the statutory short-form, he was nonetheless charged with manslaughter, despite the inclusion of the terms "deliberately" and "premeditated" in the indictment. *Id.* at 284, 288–89, 721 A.2d 699. " 'It is well settled that under an indictment pursuant to the statutory formula, *even though it spells out murder in the first degree,* the accused may be convicted of murder in the first degree, of murder in the second degree, or of manslaughter.' " *Id.* at 289, 721 A.2d 699 (quoting *State v. Ward,* 284 Md. 189, 200, 396 A.2d 1041 (1978)).

In the case *sub judice,* the trial court instructed the jury on the offense of first-degree felony murder, as follows:

> With regard to the charge of First Degree Felony Murder, you must be satisfied that the State has proven beyond a reasonable doubt that [appellant] or another person participating in the crime with [appellant] attempted to commit Robbery with a Dangerous Weapon.

> The second element, that [appellant] or another person participating in that crime killed Maurice Thomas Powell.

> And, third, that the act resulting in the death of Maurice Thomas Powell occurred during the attempted commission of Robbery with a Dangerous Weapon.

> Felony murder does not require that the State prove that [appellant] intended to kill Mr. Powell.

Over the State's objection, the trial court also instructed the jury on the crime of involuntary manslaughter, as follows:

> In order to find [appellant] guilty of Involuntary Manslaughter, you must be satisfied that the State has proven beyond a reasonable doubt, first, that [appellant], or another person participating in the crime with him, [a]ttempted to [c]ommit Robbery With a Dangerous Weapon; that [appellant], or another person participating with him in the crime, killed Maurice Thomas Powell, and the act occurred during the attempted commission of Robbery with a Dangerous Weapon.

The jury convicted appellant of first-degree felony murder and involuntary manslaughter.

Appellant argues that, in this case, the two crimes shared identical elements and further posits that,

[i]f a defendant is convicted of two crimes arising out of one incident and one crime is a lesser-included offense of the other, the court can sentence the defendant for the greater offense. If a defendant is convicted of two crimes arising out of one incident and the crimes have identical elements, it is not entirely clear for which crime the court can sentence the defendant. Two cases from the Court of Appeals, however, compel the conclusion that in a situation like the instant one the defendant must be sentenced for the crime carrying the lesser penalty. . . .

Appellant relies upon *Waye v. State,* 231 Md. 510, 191 A.2d 428 (1963) and *Stubbs v. State,* 406 Md. 34, 956 A.2d 155 (2008) in support of this proposition. Waye was convicted of four counts of "obtaining money by false pretenses. . . ." 231 Md. at 512, 191 A.2d 428. He appealed, challenging the sufficiency of the evidence. Waye was charged and convicted under the False Pretenses Act, although each offense involved the cashing of a worthless check, which could have been prosecuted under the Worthless Check Act. *Id.* Under the False Pretenses Act, the State was required to show "a representation of a past or existing fact made with intent to defraud, and that the operation of such representation as a deception induced a transfer and the obtaining of the money by the person committing the fraud, to the loss of another." *Id.* at 513, 191 A.2d 428. By contrast, the Worthless Check Act made criminal "the giving of a worthless check, for value, *prima facie* evidence of an intent to cheat and defraud." *Id.* at 514, 191 A.2d 428. They are "separate and distinct criminal offenses." *Id.* (citing *Willis v. State,* 205 Md. 118, 125, 106 A.2d 85 (1954)). Because the State proceeded under the False Pretenses Act, Waye argued that the State had to prove a "false representation outside the worthless check." *Id.* at 514, 191 A.2d 428. The Court affirmed the trial court's finding of an

intent to cheat and defraud under the False Pretenses Act, but noted that the amount of money obtained was less than $100.

The Court explained that, until 1955, the False Pretenses Act and the Worthless Check Act provided for the same penalty, ten years imprisonment. *Id.* at 515, 191 A.2d 428. The Worthless Check Act was amended to distinguish the penalties for offenses involving less than $100, providing for a fine of $50 and imprisonment for up to eighteen months, or both. *Id.* at 515–16, 191 A.2d 428. Thus, the Court considered whether the amendment to the Worthless Check Act amended, by implication, the False Pretenses Act "to the extent that when a worthless check is involved and the value of the property obtained is less than $100, then the prosecution must be under the [Worthless Check Act] and not under [the False Pretenses Act]?" *Id.* at 516, 191 A.2d 428. The Court further questioned whether the legislature intended "to limit the penalty under the above circumstances if the prosecution be brought under [the Worthless Check Act], but permit the higher penalty ... if, under identical facts, the prosecution be brought under [the False Pretenses Act]?" *Id.* The Court held that it did not, as "[r]epeals by implication are not favored" and it did not "believe that the Legislature intended to create such an anomalous and incongruous situation as to limit the penalty ... but to permit a much higher and more severe penalty under identical facts simply because someone decides to bring the prosecution under [the Worthless Check Act.]" *Id.* at 516, 191 A.2d 428. Thus, the maximum penalty that could have been imposed was a fine of $50 and/or up to eighteen months' imprisonment. *Id.*

In *Stubbs*, 406 Md. 34, 956 A.2d 155, the defendant was charged, convicted and sentenced for theft under $500, although the evidence presented at trial demonstrated that he stole a wrench set with a value of $69.93. *Id.* at 41, 956 A.2d 155. The defendant argued that the State was required to prove that he stole at least $100 worth of property when prosecuting a charge of theft under $500, or, alternatively, the maximum sentence that could be imposed on a conviction of theft under $500 when the evidence presented established a

value under $100 to the maximum sentence of theft under $100. *Id.* at 38, 956 A.2d 155. The Court rejected both arguments.

The Court opined:

By Chapter 130, Acts of 2004, Maryland's Consolidated Theft Statute was amended to add the offense of theft of property or services with a value of less than $ 100 ("theft under $ 100"). It is clear from the legislative history that this offense was created (in the words of the FLOOR REPORT of Senate Bill 513, which was passed by the General Assembly and signed by the Governor on April 27, 2004) "in an attempt to keep some relatively minor theft-related cases before the District Court." It is also clear that the General Assembly intended that, unless this new offense was specifically charged by the State, the offense of theft under $ 100 would not be a lesser included offense of theft of property or services with a value of less than $ 500 ("theft under $ 500").

*Id.* at 36–37, 956 A.2d 155.

Thus, the Court held

... that if a defendant has not been specifically charged with theft under $ 100, (1) the defendant cannot be convicted of that offense, (2) a conviction for theft under $ 500 does not require proof that the defendant stole property or services worth at least $ 100, and (3) the penalty for theft under $ 100 does not limit the sentence that can be imposed on the defendant convicted of theft under $ 500.

*Id.* at 38–39, 956 A.2d 155.

Appellant combines the analysis of these two cases and argues that, together, they stand for the proposition that, "when a defendant's conduct constitutes a violation of two statutes with the same elements, the trial court is required to sentence the defendant under the statute carrying the lighter sentence unless there is an indication that the Legislature intended that the defendant be sentenced under the statute carrying the greater sentence." Appellant posits that the legislature has not indicated an intent to punish a defendant

convicted of both involuntary manslaughter and felony murder should be sentenced for felony murder when both crimes were proven with the same elements. Appellant further argues that the General Assembly has not indicated that the penalty, under these circumstances, should be limited to the sentence for felony murder. Appellant claims that "the fact that it did not [do so] with respect to the statutes at issue in this case, therefore, is significant." According to appellant, based upon the foregoing, he should have been sentenced for involuntary manslaughter, carrying a maximum penalty of ten years, or his sentence for felony murder should not have exceeded ten years.

The State counters, without citation to authority, that unlawful act involuntary manslaughter is a lesser included offense of first-degree felony murder. Accordingly, the State argues, citing *Simms v. State,* 288 Md. 712, 724, 421 A.2d 957 (1980), that, because appellant was also convicted of felony murder, the greater offense, the trial court was not constrained to impose the penalty for the lesser offense of involuntary manslaughter.

■ We are not persuaded by either argument. The State properly observed, in its objection to the court's instruction on voluntary manslaughter, that the crime was not properly before the jury. Manslaughter is a common law offense with a statutorily prescribed penalty. C.L. § 2–207. In other words, the elements for the unlawful act variety of involuntary manslaughter, the type of manslaughter at issue in this case, have not been delineated by the legislature. The elements have, however, been set forth in the Maryland Criminal Pattern Jury Instructions, as follows:

INVOLUNTARY MANSLAUGHTER—UNLAWFUL ACT

The defendant is charged with the crime of involuntary manslaughter. In order to convict the defendant of involuntary manslaughter, the State must prove:

(1) that the defendant [or another participating in the crime with the defendant] [committed] [attempted to commit] an (unlawful act(s));

(2) that the defendant [or another participating in the crime] killed (victim); and

(3) that the act resulting in the death of (victim) occurred during the [commission] [attempted commission] [escape from the immediate scene] of the (unlawful act(s)).

MPJI–Cr 4:17.9B.

The trial court clearly employed the pattern instruction and inserted the offense of attempted robbery with a dangerous weapon, C.L. § 3–402,[8] as the "unlawful act." Robbery with a dangerous weapon is a felony.

Criminal Law § 2–201(a) provides that "a murder is in the first degree if it is (1) a deliberate, premeditated, and willful killing; (2) committed by lying in wait, (3) committed by poison; or (4) committed in perpetration or an attempt to perpetrate . . . (ix) robbery under § 3–402 or § 3–403 of this article. . . ."

Judge Moylan, in his treatise, Criminal Homicide Law, explains:

The law is clear that where one of the statutorily designated felonies (or their attempts) spelled out in Crim. Law § 2–201(a) is involved, the verdict must be first-degree murder or nothing. **There is no lesser included second-degree form or manslaughter form of the crime involved and no instruction on such lesser offenses should be given.**

---

**8.** C.L. § 3–402 provides:

Robbery with dangerous weapon
   (a) Prohibited.—A person may not commit or attempt to commit robbery under § 3–402 of this subtitle:
      (1) with a dangerous weapon; or
      (2) by displaying a written instrument claiming that the person has possession of a dangerous weapon.
   (b) Penalty.—A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 20 years.

JUDGE CHARLES E. MOYLAN, JR., CRIMINAL HOMICIDE LAW § 5.2 at 115 (2002) (emphasis added).

In *Lee v. State*, 186 Md.App. 631, 661, 975 A.2d 240, *cert. granted*, 411 Md. 355, 983 A.2d 431 (2009), the defendant was convicted of first-degree felony murder, first-degree burglary, first-degree assault and use of a handgun in the commission of a felony and crime of violence. *Id.* at 637, 975 A.2d 240. Lee argued that the trial court erred in refusing to instruct the jury on the charges of second-degree murder and involuntary manslaughter. Similar to appellant in this case, Lee argued that, because the State charged him with a short-form indictment, "second-degree murder and involuntary manslaughter were charged offenses on which [he] was entitled to an instruction." *Id.* at 660, 975 A.2d 240. The only charge that the State submitted to the jury, without objection from Lee, was first-degree felony murder because the "prosecutor effectively nol prossed the charges of first-degree premeditated murder, second-degree murder, and manslaughter." *Id.* at 661, 975 A.2d 240 (citing *Jackson v. State*, 322 Md. 117, 123, 124 n. 3, 586 A.2d 6 (1991); *Dean v. State*, 325 Md. 230, 234, 600 A.2d 409 (1982)).

This Court made clear in *Lee* that, although a defendant is entitled to an instruction on lesser included offenses, when a charge of first-degree felony murder has been submitted to the jury, fundamental fairness requires instructions on second-degree murder and involuntary manslaughter "only if they are lesser included offenses of first-degree felony murder." *Id.* at 662, 975 A.2d 240 (citing *Malik v. State*, 152 Md.App. 305, 333, 831 A.2d 1101 (2003); *Sutton v. State*, 139 Md.App. 412, 458, 776 A.2d 47 (2001); *West v. State*, 124 Md.App. 147, 161, 720 A.2d 1253 (1998)).

Unlawful act manslaughter is not a "lesser included" offense of first-degree felony murder. Judge Moylan explains in his treatise:

The third kind of manslaughter (the second kind of involuntary manslaughter) is the junior varsity manifestation of common law felony murder. In establishing criminal

responsibility for an unintended homicide, its rationale parallels that of the felony murder doctrine in every regard. Under both doctrines, the harm being redressed is a homicide; the causative *actus reus* was the perpetration or attempted perpetration of a crime; the *mens rea* was the intent to perpetrate that crime. The difference between the two grades of criminality is that in the junior varsity context, the degree of blameworthiness is ratcheted down one level by virtue of the fact that the predicate crime was something less than a life-endangering felony.

. . . .

In terms of what label to put on this variety of involuntary manslaughter, the earlier cases, in Maryland and elsewhere, tended to use the term "misdemeanor manslaughter."

. . . .

The rhetorical parallel structure to the "felony murder doctrine" underscored the generative symmetry between the two doctrines. The term "misdemeanor," moreover, was once an unerring reference to the triggering device. The evolving insistence that the triggering act be *malum in se* rather than merely *malum prohibitum* effectively eliminated anything less than a misdemeanor, such as a civil trespass or a regulatory infraction, as the catalytic agent for the doctrine. At the other end of the spectrum, the apparent inclusiveness of the felony murder doctrine, arguably embracing all early felonies, effectively eliminated anything greater than a misdemeanor as the triggering device. The term "misdemeanor manslaughter doctrine," therefore, once served quite nicely. . . .

As the centuries have unfolded, however, the felony murder doctrine has been fine-tuned. As the catalyst for the greater guilt has been narrowed to those felonies that are apparently life-endangering under the circumstances of their perpetration or attempted perpetration, a residuary category of other non-life-endangering felonies has been created. What is to be done with these apparently non-life-endangering felonies when deaths nonetheless unexpectedly

result from their perpetration? If they are no longer part of the felony murder doctrine, what are they? As "felonies," they will not linguistically fit into the "misdemeanor-manslaughter" mold. As a categorical label, the term "misdemeanor-manslaughter," therefore, has, now at least, become underinclusive.

As a happy solution to this niggling little terminological problem, the usage "unlawful act-manslaughter" is conveniently broad enough to incorporate everything the common law ever intended to incorporate.

CRIMINAL HOMICIDE LAW § 11.1 (citations and footnotes omitted).

■ In this instance, there is no question that the "unlawful act" was the attempted robbery with a dangerous weapon, a life-endangering felony specifically enumerated in the first-degree murder statute. Appellant correctly observes that, in this case, the elements of first-degree murder and unlawful act manslaughter were the same under the court's instructions. The unlawful act manslaughter instruction, however, was given in error. Although the trial court erred, appellant was not prejudiced because the jury also found sufficient evidence to convict appellant of first-degree felony murder based upon the attempted robbery of Powell. Accordingly, we affirm.

**JUDGMENT AFFIRMED, IN PART, AND REVERSED, IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY TO MERGE THE CONVICTION FOR ATTEMPTED ROBBERY OF MAURICE POWELL INTO CONVICTION FOR FELONY MURDER AND TO VACATE THE SENTENCE FOR ATTEMPTED ROBBERY WITH A DANGEROUS WEAPON.**

**COSTS TO BE PAID THREE–FOURTHS (3/4) BY APPELLANT AND ONE–FOURTH (1/4) BY PRINCE GEORGE'S COUNTY.**